STATE of Wisconsin, EX REL. N/S ASSOCIATES by JMB Group Trust IV., its general partner, Petitioner-Appellant,

v.

BOARD OF REVIEW OF the VILLAGE OF GREENDALE, Village of Greendale, and Bernard G. Schroedl, Leo M. Taylor, and Edward O. Arntson, in their representative capacities, Respondents.

Court of Appeals

No. 90-2546. *Submitted on briefs April 2, 1991.—Decided July 23, 1991.*

(Also reported in 473 N.W.2d 554.)

35

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Timothy C. Frautschi* and *Lynette M. Zigman* of *Foley & Lardner* of Milwaukee.

On behalf of the respondents, the cause was submitted on the briefs of *Stephen W. Hayes* and *Timothy G. Dugan* of *von Briesen & Purtell, S.C.* of Milwaukee.

Before Moser, P.J., Fine and Anderson, JJ.

FINE, J. This is an appeal from a judgment affirming a decision by the Village of Greendale Board of Review. The Board upheld the assessment of the Southridge mall for the 1989 tax year. The mall is owned by N/S Associates by JMB Group Trust IV, and was assessed at $100,968,000 for the 1989 tax year as follows: $2,020,900 for the land, and $98,947,100 for the buildings.

The 1989 assessment was a substantial increase over the mall's 1987 assessment of approximately $33 million, and was triggered by the property's sale to N/S Associates in 1988 for $114,737,091.[1] The Village's assessor, Frederick F. Graves, testified before the Board of Review that he determined that this sale price reflected the mall's fair market value as of January 1, 1989, and that he arrived at the mall's 1989 assessment by applying to this value the Village's average ratio of assessment to fair market value of eighty-eight percent.

N/S Associates objected to the assessment, pursuant to section 70.47(7), Stats. As required by section 70.47(8), Stats., the Board held a hearing on the objection. After five days of testimony, the Board unanimously affirmed the assessment. N/S Associates filed this certiorari-review action under section 70.47(13),

---

[1]The Wisconsin Real Estate Transfer Return executed by both the seller and purchaser of the mall, and dated April 4, 1988, represented that the total value of the real estate transferred was $114,737,091. The exchange agreement between the parties represented that the property had an "agreed value" of "114,947,091.00, allocated as follows: $5,000,000.00 for the Land; $10,000,000.00 for the Intangible Property; $200,000.00 for the Personal Property; and the balance for the Improvements." The April 4, 1988, closing statement prepared for the transaction lists the property's "agreed value" as $114,947,091.

Stats. The trial court affirmed the Board of Review, and N/S Associates appeals.

N/S Associates raises five issues on this appeal. First, it contends that the Board of Review erred in concluding that the 1988 sale was an arm's-length transaction and that the sale price was thus an appropriate basis for the assessment. Second, it claims that the $114,737,091 sale price "included non-real estate elements of value" that should not have been counted towards the assessment. Third, N/S Associates argues that the assessment improperly included the mall's intangible value as a going concern. Fourth, N/S Associates submits that it presented to the Board of Review the only credible evidence of the mall's value. Finally, it claims that the assessment was discriminatory and, therefore, in excess of the Board's jurisdiction. We affirm.

## I.

Since this is an appeal on certiorari, the scope of our review is "strictly limited." *See State ex rel. Geipel v. City of Milwaukee,* 68 Wis. 2d 726, 731, 229 N.W.2d 585, 588 (1975). Thus, we may only consider:

1. Whether the Board 'kept within its jurisdiction';

2. Whether the Board 'acted according to law';

3. Whether the action taken by the Board 'was arbitrary, oppressive or unreasonable' so as to represent 'its will and not its judgment'; and

4. Whether the evidence before the Board was such 'that it might reasonably' sustain the assessment.

*Ibid.* In the context of this case, our inquiry must focus on whether the assessment was made in accordance with

the pertinent statutory directives. *See id.,* 68 Wis. 2d at 732, 229 N.W.2d at 588. If the assessment was made in compliance with the statute, the assessment must be upheld "if there is any evidence to support it." *Ibid.* These analyses present questions of law. *See ibid.* Accordingly, although we have been greatly assisted by the trial court's thoughtful and comprehensive oral decision, we must independently evaluate the Board of Review's determination. *See Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984) (appellate courts decide questions of law without deference to trial court's decision).

## II.

■ The method of real-property assessment in Wisconsin is governed by statute. Section 70.32(1), Stats. As pertinent to this appeal, section 70.32(1) provides:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value the assessor shall consider, as to each piece, its advantage or disadvantage of location . . ..[2]

"Full value," as that term is used in section 70.32(1), is "fair market value," which is "the amount [a parcel of

[2]Section 73.03(2a), Stats., directs the Wisconsin Department of Revenue to publish and distribute "detailed assessment manuals" that "discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level."

property] will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *See State ex rel. Mitchell Aero, Inc. v. Board of Review,* 74 Wis. 2d 268, 277, 246 N.W.2d 521, 526 (1976); 1 *Property Assessment Manual for Wisconsin Assessors* 7–3 (Rev. 12/87). The *Assessment Manual* outlines the following "conditions that are necessary for a sale to be considered a 'market value' transaction":

1. It must have been exposed to the open market for a period of time typical of the turnover time for the type of property involved.

2. It presumes that both buyer and seller are knowledgeable about the real estate market.

3. It presumes buyer and seller are knowledgeable about the uses, present and potential, of the property.

4. It requires a willing buyer and a willing seller, with neither party compelled to act.

5. Payment for the property is in cash, or typical of normal financing and payment arrangements prevalent in the market for the type of property involved.

6. The sales price must include all of the rights, privileges, and benefits of the real estate. For rental property, this includes both the lessor's and lessee's interests.

*Ibid.* If these conditions attend a recent sale of the property, that sale price is the "best information" of "full value" and, accordingly, is the value for tax-assessment purposes. Section 70.32(1), Stats.; *Darcel, Inc. v. Manitowoc Review Bd.,* 137 Wis. 2d 623, 628–630, 640, 405 N.W.2d 344, 346–347, 351 (1987); *see also Flood v.*

*Lomira Bd. of Review,* 153 Wis. 2d 428, 435, 451 N.W.2d 422, 425 (1990) ("The terms 'full value,' 'market value' and 'fair market value' are synonymous and interchangeable" for tax-assessment purposes.).

As we have seen, assessment must be based on value, and the best information of value is an arm's-length sale. Thus, a taxpayer contending that a recent sale does not represent the property's value because the sale was not at arm's-length has the burden of proving that any circumstance it claims made the sale not an arm's-length transaction actually affected the price. *See Flood,* 153 Wis. 2d at 437, 451 N.W.2d at 426.[3] We examine N/S Associates' contentions, in the order raised, against this background.

A. *The sale as an arm's-length transaction.* N/S Associates asserts that the 1989 sale of the Southridge mall was not at arm's-length, and gives five reasons. We discuss them in turn.

1. N/S Associates argues that because its purchase of the Southridge mall was simultaneous with, and contingent on, its purchase of the Northridge mall from the same seller, "the sale of Southridge was not a stand-

---

[3]The taxpayer in *Flood* had recently purchased a mobile home park. He argued that the board of review erred in rigidly applying the sale price in determining value without considering whether and to what extent that price was affected by favorable financing provided by the seller. *Id.,* 153 Wis. 2d at 432–433, 451 N.W.2d at 423–424. The supreme court agreed and noted that the *Assessment Manual* directs assessors to, as phrased by the court, "examine the financing terms between the seller and buyer to determine whether the sale price accurately reflects [the] market value of the real property." *Flood,* 153 Wis. 2d at 439, 451 N.W.2d at 427.

alone market sale that would constitute the best evidence of value." Although it may be true that the combined ownership of both properties in a single entity is more valuable than the separate ownership of each, the evidence before the Board was mixed and N/S Associates did not show how—if at all—the sale price of Southridge was affected by the combined ownership.

One of the witnesses called by N/S Associates estimated that the combined ownership of Northridge and Southridge resulted in increased rental income to Southridge of "one to two dollars per square foot" or a total of $920,000 a year. On the other hand, an appraisal expert who testified on behalf of the Village told the Board that although there were costs savings for Southridge because of the combined ownership, they were "slight" and that "the receipts obtained by Southridge" were similarly not affected by the combined ownership "to any significant degree." As the trial court cogently pointed out in its oral decision, there is "no evidence" that N/S Associates "*actually* paid more than what the property was worth on the market" as a result of the Northridge/Southridge synergy. (Emphasis added.) Absent such evidence, the Board of Review did not err in rejecting N/S Associates' contention.

■

2. N/S Associates argues that the sale price was inflated by the "extensive relationships" between the parties involved in the sale. Prior to the property's sale, one of the JMB Realty companies managed Southridge for the mall's owner. Upon learning that the owner was interested in selling the property, and had "hired or attempted to hire or started to hire" a New York investment banking firm to "market the property for sale," JMB approached the owner with its own plans for the property. Ultimately, JMB negotiated the property's sale

to N/S Associates, which is a partnership of various tax-exempt entities (pension funds, profit-sharing plans, charitable foundations, and university endowment funds). An officer of JMB testified that in addition to its continuing post-sale management of the property for a fee, its compensation for putting the package together depended on the price paid for the property: "The higher the purchase price . . . the higher JMB's front end fee." He would not, however, testify that this in fact happened, and he declined to answer directly the question posed by an attorney representing the Village of Greendale as to whether "JMB influence[d] the [investors] to purchase this property for more than what you perceived to be the fair value of that property so that JMB could earn an additional fee."

JMB was dealing with sophisticated buyers, many of whom were previously, and are currently, investors in other JMB-packaged projects. Additionally, the mall's seller was, as both parties recognize, a knowledgeable and sophisticated real estate enterprise and was not under any compulsion to sell. There is no evidence in the record that JMB's prior relationship with the seller, or its alleged incentive to obtain a high sale price for the property, had any effect on the price.[4]

---

[4]N/S Associates' brief on appeal apparently recognizes the tension inherent in its argument that JMB's interest in getting a higher fee inflated the price:

> Consequently, JMB had an incentive to persuade investors to purchase Southridge Mall, and to establish a high price. JMB also advised investors in [N/S Associates] on other potential investments. It had an ongoing fiduciary relationship with the investors.

(Record references omitted.) If JMB had, without the investors' knowledgeable consent, pumped-up the price in order to inflate its fee, as N/S Associates' brief asserts there was an incentive to do, JMB would have breached its fiduciary duty to the investors,

3. N/S Associates next contends that the mall was not sufficiently exposed to the market prior to sale. As the Village points out, however, this argument is a dead-end in logic: implicit in the argument is the contention that if the seller of Southridge had not dealt with JMB but, rather, had either stayed with the New York investment banker or had attempted to market the mall in some other way, the price would have been *lower!* Clearly, the requirement that property be "exposed to the open market for a period of time typical of the turnover time for the type of property involved," *Assessment Manual* at 7-3, is to insure that the property is sold for as *high* a price as possible so that the taxing authority is not short-changed by a low price resulting from an owner's rush to sell.

4. N/S Associates also argues that since the sale of the mall was structured as a tax-free exchange under I.R.C. § 1031, the price did not reflect the mall's true value. In support of that proposition, N/S Associates refers to the *Assessment Manual* at 14-6 and 14-7, which points out that it is "impractical" to determine the price for property that is exchanged for other property "since no conversion of the consideration to monetary terms is made," *id.,* at 14-7. The tax-free exchange under I.R.C. § 1031 here, however, was made on the basis of "monetary terms" that were specifically spelled out in the exchange agreement between the mall's owner and JMB Group Trust IV; the parties' contract set the

namely N/S Associates. *See* Restatement (Second) of Agency § 390 comment c (1957) ("The agent must not take advantage of his position to persuade the principal into making a hard or improvident bargain.").

mall's "agreed value" at $114,947,091.00.[5] The exchange agreement's terms were consistent with a typical exchange under I.R.C. § 1031, *see Alderson v. Commissioner of Internal Revenue,* 317 F.2d 790 (9th Cir. 1963); 9 Stand. Fed. Tax Rep. (CCH) ¶ 31,508.268 (1991). This was not the simple barter situation referred to by the *Assessment Manual.* Indeed, other than the favorable tax treatment afforded by I.R.C. § 1031, the exchange here was, as testified to by a real estate appraiser and consultant hired by the Village, "no different than any cash transaction."

5. N/S Associates claims that the investors' status as tax-exempt entities "affects the price they may be willing to pay." The argument is not otherwise developed and N/S Associates points to nothing in the record that indicates that the price *was* affected by the investors' status. Accordingly, we decline to address this issue. *See In re Estate of Balkus,* 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985). In any event, it cannot be assumed that a tax-exempt purchaser "will pay more for an income-producing property than the market requires that it must pay, especially when it compares other investment opportunities." *Lane Bryant, Inc. v. Tax Comm'n of New York,* 249 N.Y.S.2d 994, 995 (N.Y. App. Div. 1964) *(per curiam), aff'd,* 225 N.E.2d 882 (N.Y. 1967).

N/S Associates has pointed to five circumstances that it claims demonstrate that the sale of the Southridge property was not an arm's-length transac-

---

[5]As previously noted, the exchange agreement allocated the $114,947,091 as follows: $5 million for the land, $10 million for "the Intangible Property," $200,000 for "the Personal Property," and "the balance for the Improvements."

tion. Yet, as we have seen, it has not shown that any of the circumstances affected the price it paid for the property. Thus, unless the appraisal is otherwise infected, the sale price stands as the statutory "best information" of the property's value. *See Flood,* 153 Wis. 2d at 436–438, 451 N.W.2d at 425–426.

B. *Alleged non-real estate elements of value.* N/S Associates points to four areas where the assessor's valuation of the Southridge mall allegedly included non-real estate elements. We discuss those areas in turn.

1. The *Assessment Manual* requires that a cash equivalent adjustment be made when a buyer assumes a mortgage at lower than prevailing interest rates. *Id.,* at 7-21, -22; *see also Flood,* 153 Wis. 2d at 439–440, 451 N.W.2d at 427 (seller-financed transactions). Thus, N/S Associates argues that the sales-price valuation here should have been adjusted to reflect the fact that the buyer assumed a mortgage of approximately $18 million at 8.42 per cent. The loan, made by a third-party institutional lender, had a 35-year amortization schedule and was payable in 2008. A JMB executive testified that these terms "compared very favorable to what was available in the market" at the time for several reasons:

> Number one, you cannot get today 35 year loans. You can get seven, maybe ten year loans, but you can not get 35 year amortization schedules; you can not and you were unable to get, at the time of acquisition, rates equivalent to 8.42 percent; they were significantly higher than that. And I think most important is in all likelihood you would have a very difficult time getting any debt on Southridge Mall today and the reason being there is asbestos on the property, and you'd have a difficult time finding lenders who will lend against property that contains asbestos.

The Village's expert witness, on the other hand, testified that the $18 million assumed mortgage did not have "any particular significance" because, among other reasons, "it's for a very small portion of the purchase price." Unlike the situation in *Flood,* where the taxpayer presented evidence that the seller-financing was equivalent to approximately $160,000 of the $650,000 purchase price, *id.,* 153 Wis. 2d at 432, 451 N.W.2d at 424, N/S Associates presented no evidence that would give the Board of Review a basis for evaluating the degree to which, if any, the sales price should have been adjusted to account for the assumed mortgage. Absent this evidence, and in light of the testimony by the Village's expert witness, which the Board was free to credit, the evidence before the Board of Review was such "that it might reasonably" sustain the assessment. *See Geipel,* 68 Wis. 2d at 731, 229 N.W.2d at 588. Accordingly, under the limited scope of our review, we conclude that the assessor's apparent failure to consider the assumed $18 million mortgage does not warrant reversal.

2. N/S Associates also argues that the investors who purchased the Southridge mall were also buying "the right to have JMB continue as manager" of the property as well as "the ability to invest in major property that the investors could not have invested in alone." Although, as N/S Associates correctly points out in its appellate brief, "the total consideration paid in a syndicated deal is likely to exceed the fair value of the real estate," that "total consideration" does not all go to the seller. Rather, that portion of the moneys paid by the investors that exceed the property's value and that represents the special syndication-value of the deal would, naturally, go to the syndicators. Here, as we have seen however, the exchange agreement by which the transac-

tion was accomplished, *valued the mall,* including $200,000 in personal property, at $114,947,091, and obligated the purchasers to transfer property worth *that amount* to the mall's seller. There is no evidence in the record that the price paid to the *seller* of the Southridge mall, upon which the assessor based his assessment, as opposed to what may have been paid to the syndicators by the investors, reflected any special value the investors might have received as a result of the syndication.

3. N/S Associates next contends that the investors were also purchasing the synergistic value of the Southridge mall in conjunction with the Northridge mall. As we have already pointed out, however, there is no evidence in the record as to how the increased value of Southridge—if any—that was attributable to Northridge affected—if it did—the price paid for Southridge. See the discussion at part II. A.1, above.

4. N/S Associates asserts that the assessment improperly included approximately 3.5 acres of land that is outside the Village of Greendale because the purchase price included both the land inside the Village and land outside the Village. As we have seen, the land was assessed at $2,020,900. The Village claims, however, that N/S Associates did not object to the land's assessment and, accordingly, waived this issue. *See* sec. 70.47(7)(a), Stats. ("No person shall be allowed in any action or proceedings to question the amount or valuation of property unless such written objection has been filed [with the clerk of the board of review]."); *Herzfeld-Phillipson Co. v. Milwaukee,* 177 Wis. 431, 434–440, 189 N.W. 661, 662–664 (1922) (taxpayer who does not file with the board of review an objection to assessment of property that lies outside of taxing district waives right to contest assessment). N/S Associates admits in its reply brief

that it "did not challenge the assessment of the land."
N/S Associates contends, however, that its failure to
object to the land portion of the assessment is not mate-
rial because "[t]he total assessment was equal to the total
purchase price, and that price included some land
outside of [the Village of] Greendale." An expert witness
who testified on behalf of N/S Associates before the
Board of Review, however, prepared an appraisal report,
which was specifically limited to that portion of the
Southridge property located within the Village of Green-
dale and which adopted the assessor's assessment of the
land. The issue of waiver aside, there was thus sufficient
evidence in the record for the Board of Review to con-
clude that the mall's land within the Village of Greendale
was properly assessed at $2,020,900.

5. In an undeveloped argument, N/S Associates
contends that some of the leasehold improvements were
taxed both to the tenants and to Southridge mall. N/S
Associates has directed us to no evidence in the record in
support of its supposition that any property was taxed
twice and we have found none. Accordingly, there is no
basis for us to conclude that the Board of Review erred
in this regard. *See Balkus,* 128 Wis. 2d at 255 n.5, 381
N.W.2d at 598 n.5.

C. *Value as a Going Concern.* N/S Associates
argues that in fixing the fair market value of the
Southridge mall at the price for which it was sold, the
assessor and the Board of Review improperly included
the mall's "business value." This argument presents an
issue of first impression in Wisconsin.

In support of its contention that the business value
of the mall was improperly included as an element of
value, N/S Associates points out that the cost to
reproduce a "brand spanking new" Southridge mall

would be approximately $62 million, with a replacement cost after depreciation of approximately $50 million. Thus, they argue that since " 'a well-informed buyer will pay no more for a property than the cost of constructing an equally desirable substitute property with like utility' " (quoting *Assessment Manual* at 7–14), the difference between the price N/S Associates paid for the mall and the replacement cost represents a non-taxable "going concern value." We disagree.

■

Assessable real property in Wisconsin "include[s] not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto." Section 70.03, Stats. Additionally, the property's value for taxation purposes is affected by, *inter alia,* "its advantage or disadvantage of location." Section 70.32(1), Stats. Thus, a "brand spanking new" Southridge mall is worth more located where it is in the Village of Greendale than it would be if it were located on the frozen arctic tundra, irrespective of the cost of construction. The significance of "advantage or disadvantage of location" as an element of value in Wisconsin is a major reason why, absent circumstances to the contrary, value is best fixed at what the property would bring in an arm's-length sale. *See* sec. 70.32(1) ("Real property shall be valued by the assessor . . . at the full value which could ordinarily be obtained therefor at private sale."); *cf. State ex rel. Oshkosh Country Club v. Petrick,* 172 Wis. 82, 84, 178 N.W. 251, 252 (1920) (valuation of club facility had to take into account that the property "could not be sold as a golf course" but, rather, as farm land). Thus, in order for a property's cost of reproduction to be a cap on value, the reproduction must be "an equally desirable substitute property with like utility." *Assessment Manual* at 7–14. Certainly, an

arctic-based "brand spanking new" Southridge-type mall would not be "an equally desirable substitute" for the one in the Village of Greendale. The key of the analysis is whether the value is appended to the property, and is thus transferrable with the property, or whether it is, in effect, independent of the property so that the value either stays with the seller or dissipates upon sale. *See Oshkosh Country Club,* 172 Wis. at 84, 178 N.W. at 252 (A non-transferable use may not be considered as an element of value.). This proposition is at least tacitly recognized by two of the three out-of-state cases on which N/S Associates relies, *Heritage Cablevision v. Board of Review,* 457 N.W.2d 594 (Iowa 1990) and *Madonna v. County of San Luis Obispo,* 39 Cal. App.3d 57, 113 Cal Rptr. 916 (1974).

*Madonna* and *Heritage Cablevision* both concerned situations where the value of the property was substantially influenced by the non-transferrable nature of the business conducted on the property. In *Madonna* the property was an inn consisting of a motel, restaurant, and shops. *Id.,* 39 Cal. App. 3d at 59. The property was characterized by the county board of supervisors, sitting as a board of equalization, as "a unique structure in the world" that was "conceived, built and constantly managed over the years by" the owners. *Id.,* 39 Cal. App.3d at 60. Unlike the situation here, the assessment in *Madonna* was not based on a recent sale of the property, and the assessor sought to justify the assessment by capitalizing the inn's income. *Id.,* 39 Cal. App.3d at 59. The court agreed with the board that capitalizing "enterprise income" was " 'inappropriate and misleading' in the circumstances of this case." *Id.,* 39 Cal. App.3d at 61. Similarly, in *Heritage Cablevision,* which also concerned the use of a capitalized-income method of valuation, the court held that it was improper to include the substan-

tial income-producing nature of a cable-television franchise as an element of value for the physical property from which the business operated. *Id.,* 457 N.W.2d at 598–599.

In contrast to *Madonna* and *Heritage Cablevision,* Southridge mall's *raison d'etre*—namely, the leasing of space to tenants and related activities such as trash disposal, baby stroller rentals, etc.—is a transferrable value that is inextricably intertwined with the land and "all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto," sec. 70.03, Stats., just as the transferrable value of a farm—the growing of crops—is inextricably intertwined with the property from which the farm operates.[6] In light of Wisconsin's pre-eminent focus on what property will bring in an arm's-length sale as the basis of value, tax assessment under section 70.32(1), Stats., may include as a component of value the property's transferrable income-producing capacity that is reflected by a recent sale. Since there was substantial evidence before the Board of Review that it was not possible to separate Southridge mall's non-transferrable income-producing capacity from the elements of real estate that are set out in section 70.03 (the land and "all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto"), N/S Associates assignment of error in this regard fails. [7]

---

[6]The income approach may, of course, be used to assess farm property. *Assessment Manual* at 11–31.

[7]Thus, for example, an expert in shopping center management, leasing, consulting, and appraisal called by N/S Associates testified that he had never seen a purchaser of a large shopping mall distinguish between the real estate and the going-concern component of the property because it "is very difficult to break

D. *Evidence of Value.* Both the Village and N/S Associates presented expert witnesses who gave their opinions concerning the Southridge mall's value using the capitalization-of-income approach. N/S Associates argues that only the opinions of its witness are entitled to credence. We need not evaluate the substance of this argument since our determination that the sale of Southridge in 1988 was an arm's-length transaction is

out all of the various elements of income to segregate real estate from the business value." He added that although "[t]here may be some brilliant guy out there" who was capable of separately valuing the business and real estate components of a regional shopping mall, he did not know how to do it. Another appraisal expert called by N/S Associates testified that attempting to divide value "between real estate and the business value is almost an impossibility up to this particular point" although "[a] tremendous amount of research is being done on this especially by our research division of the American Institute of Real Estate Appraisers."

The third out-of-state authority cited by N/S Associates in support of its proposition that the business value of the mall was improperly included in the assessment, *People ex rel. Hotel Paramount Corp. v. Chambers,* 83 N.E.2d 839 (N.Y. 1949), draws an unclear distinction between transient hotels on the one hand and apartment or office buildings on the other. *Hotel Paramount Corp.* held that the valuation of a transient hotel "is in essence the valuation of a 'specialty,' a term including real estate, which, unlike an apartment house or office building, produces income only in combination with a business conducted upon it." *Id.,* 83 N.E.2d at 840. Farms, too, produce "income only in combination with a business conducted upon" them. Yet, as we have seen, farms in Wisconsin may be valued by their income-producing capacity. Indeed, the fair market value of a farm depends on what its land will produce. In any event, the Southridge mall is more akin to an office building than a transient hotel: almost all of the mall's income is from tenants who operate their own businesses.

56

dispositive. *See Darcel,* 137 Wis. 2d at 640, 405 N.W.2d at 351 ("[A] recent arms-length sale of the property is the 'best information' to arrive at the full tax assessment value of that property."); *Geipel,* 68 Wis. 2d at 734, 229 N.W.2d at 589 ("[W]hen an actual sale of the property under consideration has occurred, resort should not be made to extrinsic factors in determining the fair market value of the property" as long as the sale is "a fair, arm's-length transaction without compulsion or pressure on either party."). Nevertheless, we point out that the "market value" placed on the mall by JMB Group Trusts in its June 30, 1988, quarterly report to the investors in trust IV was $116 million. JMB Group Trusts' September 30, 1988 quarterly report to its investors represented the "market value" of the Southridge mall at $128 million. By the time of JMB Group Trust IV's March 31, 1989, quarterly report to investors, the "market value" of the Southridge mall had, according to the report's representation, grown to approximately $130 million. [8] Additionally, on June 10, 1987, JMB Trust IV obtained fee-simple title insurance on the property in the amount of $115 million, and on April 4, 1988, "N/S Associates c/o

[8]N/S Associates dismisses these representations as mere "marketing information pieces" rather than "real estate appraisals." Although neither Rule 911.01, Stats., nor section 70.47(8), Stats., makes the rules of evidence applicable to Board of Review proceedings, it appears that the parties and the Board tacitly assumed that the rules applied. Under the rules of evidence, the representations were admissions under Rule 908.01(4)(b), Stats. The Board was thus entitled to rely on them as it deemed appropriate. *See* Judicial Council Committee's Note to Rule 908.01(4)(b), Stats., reprinted in 59 Wis. 2d at R242; Federal Advisory Committee's Note to Federal Rule 801(d)(2), upon which Rule 908.01(4)(b) was patterned, reprinted in 59 Wis. 2d at R245; *see also Mahlandt v. Wild Canid Survival & Research Center, Inc.,* 588 F.2d 626, 630–631 (8th Cir. 1978).

JMB Group Trust IV," as grantee, and the seller as grantor, jointly executed a Wisconsin Real Estate Transfer Return that represented the "total value of real estate transferred" as "114,737,091.00." (Capitalization deleted.) Furthermore, as we have already seen, the April 4, 1988, closing statement prepared for the transaction lists the property's "agreed value" as $114,947,091, and the exchange agreement between the seller and the buyer gave the value of the mall, excluding $200,000 in "personal property" as $114,747,091.[9] (Capitalization deleted.) The Board of Review also had before it appraisals commissioned by JMB Institutional Realty that valued the leased-fee interest as of August 1, 1987 at $116 million, and one that valued the leased-fee interest as of September 1, 1988 at $128.4 million on an "all cash" basis and at $130.6 million on a "leveraged" basis.[10] There was thus ample evidence before the Board from which it could sustain the assessor's valuation of the Southridge mall.[11]

---

[9]N/S Associates contends that the values set forth in the exchange agreement, in the transfer return, and in the title insurance policy were chosen "at the insistence of the sellers of Southridge," because they "wanted a tax-free exchange of property rather than a taxable sale" and it was thus "essential" that the seller "have most of the price allocated to 'real estate.' " As we point out in footnote 8, *supra,* this explanation was for the Board to consider in assessing the evidence's weight.

[10]An owner of property subject to leasehold interests holds the "leased fee interest." *Assessment Manual* at 7–3.

[11]Although the appraisal reports were objected to as hearsay, and were not received "for the truth" of the appraisals, the Village referred to the appraisals as substantive evidence of the mall's value during the course of its final argument before the Board. Additionally, the September 1988 appraisal was mentioned during the course of the Board's on-the-record deliberations.

As noted in footnote 8, *supra,* the parties have assumed that

E. *Alleged Discriminatory Nature of Assessment.* N/S Associates' final argument is that the assessment of the Southridge mall was discriminatory. First, it asserts that the assessment violated the "uniformity clause" of the Wisconsin Constitution. Second, it claims that although other properties in the Village had also been sold subsequent to an earlier assessment, the mall was the only property that was reassessed upward for that reason. We discuss these contentions in turn.

1. The Wisconsin Constitution, art. VIII § 1, provides: "The rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods." Simply put, "all property within a class 'must be taxed on a basis of equality as far as practicable.' " *State ex rel. Hensel v. Town of Wilson,* 55 Wis. 2d 101, 106, 197 N.W.2d 794, 796 (1972) (citation

---

the rules of evidence applied to the hearing before the Board. Even if the Board's hearing was governed by the rules of evidence, a matter that we do not decide, the appraisal reports were not hearsay. *See* Rules 908.01(4)(b)2 & 4, Stats. These rules provide:

A statement is not hearsay if:

. . ..

(b) *Admission by party opponent.* The statement is offered against a party and is:

. . ..

2. A statement of which he has manifested his adoption or belief in its truth, or

. . ..

4. A statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship.

Additionally, section 70.47(8)(d), Stats., specifically permits the Board to rely on, *inter alia,* "appraisals, documents and other data which may throw light upon the value of property."

omitted). An assessment that does not comply with the uniformity clause is beyond the Board's jurisdiction and is invalid. *Id.,* 55 Wis. 2d at 109–110, 197 N.W.2d at 798; *see also State ex rel. Boostrom v. Board of Review,* 42 Wis. 2d 149, 158, 166 N.W.2d 184, 189 (1969).

An assessment violates the uniformity clause if, for some reason, one parcel of property is taxed at a higher effective rate than a similarly situated parcel of the same class. *Hensel,* 55 Wis. 2d at 106–109, 197 N.W.2d at 796–798. Thus, in *Hensel,* there was a recent sale for $13,500 of land that had been assessed at $5,700. *Id.,* 55 Wis. 2d at 103, 197 N.W.2d at 794. Following the sale, the property was again assessed at $5,700. *Ibid.* Although in an earlier proceeding the trial court had invalidated the 1968 assessment because it did not "approximate[ ] the assessment per acre for that year placed on the comparable adjoining properties," *id.,* 55 Wis. 2d at 104, 197 N.W.2d at 795, it upheld the identical 1969 assessment because it was "less than the fair sale value of the property," *id.,* 55 Wis. 2d at 103, 197 N.W.2d at 794. The Supreme Court reversed, holding that the trial court's affirmance had discriminated against the property owner solely because of the recent sale. *Id.,* 55 Wis. 2d at 107–109, 197 N.W.2d at 796–797. The court applied the principle articulated in *State ex rel. Walthers v. Jung,* 175 Wis. 58, 61, 183 N.W. 986, 987 (1921):

> A taxpayer has no complaint when a valuation which could ordinarily be obtained therefor at private sale is placed upon his property, unless there is such a general undervaluation of the other property of the assessment district as will result in an excessive tax as to him.

60

*Hensel,* 55 Wis. 2d at 108–109, 197 N.W.2d at 797. The underlying rationale is clear: "[W]hen property is the object of taxation, it should all alike, in proportion to its value, contribute towards paying the expense of such benefits and protection." *Id.,* 55 Wis. 2d at 106, 197 N.W.2d at 796 (quoting *Knowlton v. Supervisors of Rock County,* 9 Wis. 378 [*410], 388 [*420] (1859)). Thus, the issue here is whether N/S Associates has demonstrated that other property in the Village of Greendale was under-assessed in relation to its fair market value so that the Southridge mall is bearing an undue—and unconstitutional—burden.

The assessor testified before the Board that he conducted a uniformity analysis in the Village for the years 1988 and 1989 that demonstrated, in his view, that, "overall" taxation in the Village was "equitable" and "uniform." He analyzed the assessment of 237 properties that had been sold in 1988, excluding approximately fifty to seventy-five properties whose sales he believed did not reflect arm's-length transactions, and determined that the median of the ratios of pre-sale assessment to sale price was eighty-eight percent.[12] He testified that, following the methodology outlined in the *Assessment Manual,* he determined that the assessment ratios had a coefficient of dispersion from the median of 9.6 percent. He did a similar analysis for 1989, and arrived at a median of the ratios of pre-sale assessment to sale price of 84.7 percent, with a coefficient of dispersion of, again, 9.6 percent. According to the manual, a coefficient of dispersion range of between zero and nine percent is

_____

[12]As already noted, this is the percentage the assessor applied to what he determined was the $114,737,091 fair market value of the Southridge mall in arriving at his assessment of $100,968,000 for the property.

"excellent," while a range of between ten and fourteen percent is "good." *Assessment Manual* at 14–25.

The assessor also testified that he compared the pre-sale $7,130,000 assessment of the Prange store at the south end of the Southridge mall with that store's sale in 1989 for $7,898,130, and concluded that the ninety-percent ratio was within an acceptable five percent of the median. He told the Board of Review that he did not adjust the Prange store assessment because he "felt it fell within the range of ratio assessment that the majority of the properties in the Village were at." In contrast, he testified that he believed that the pre-sale assessment of the Southridge mall was substantially below what it should have been. He explained: "The 1987 assessment [of the mall] was based on the best information available, but it is obvious after the sale information became available that it did not accurately reflect the market value of Southridge."

N/S Associates has not demonstrated that the assessment of the Southridge mall violated article VII, section 1, of the Wisconsin Constitution.

2. N/S Associates also complains that Southridge was unfairly singled-out for discriminatory treatment because of all the properties in the Village of Greendale that were sold in 1988 and 1989, it was the only property that was reassessed upward. In light of the fact that the assessment did not violate the constitution's uniformity clause, and absent any proof of discriminatory motive, the complaint is without merit. Indeed, N/S Associates has not cited any authority, other than its own displeasure, in support of its contention that the assessment should be overturned even though it was properly founded on an arm's-length sale and complied with the uniformity clause. That there may be some properties

that are under assessed does not, for that reason alone, defeat an assessment that complies with the uniformity clause. *See Walthers,* 175 Wis. at 60–61, 183 N.W. at 987.

## III.

Based on the foregoing, we conclude that the Board of Review "kept within its jurisdiction," "acted according to law," was not "arbitrary, oppressive or unreasonable," and that the evidence before the Board was such "that it might reasonably" sustain the assessment. *See Geipel,* 68 Wis. 2d at 731, 229 N.W.2d at 588. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.