WASTE MANAGEMENT OF WISCONSIN, INC., Plaintiff-
Appellant,†

v.

KENOSHA COUNTY BOARD OF REVIEW and Richard E.
Ellison, Defendants-Respondents.

Court of Appeals

*No. 92–2951. Submitted on briefs April 13, 1993.—Decided
May 19, 1993.*

(Also reported in 501 N.W.2d 883.)

†Petition to review granted.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Jean G. Setterholm* of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.* of Madison.

On behalf of the defendant-respondent, Richard E. Ellison, the cause was submitted on the briefs of *Bernard R. Vash*, First Assistant Corporation Counsel.

On behalf of the defendant-respondent, Kenosha County Board of Review, the cause was submitted on

the briefs of *Donald E. Mayew* of *Phillips, Richards, Mayew & Corrigall, S.C.* of Kenosha.

Before Nettesheim, P.J., Brown and Snyder, JJ.

BROWN, J.   The issue in this case involving the tax assessment of a landfill is whether the assessor's use of the income approach required that "business value" be determined and then subtracted from the assessment. Because there was substantial evidence that the business value of the landfill was appended to the property, and not independent of it, the assessment was proper. We affirm.

Waste Management operates a landfill in Kenosha county called Pheasant Run. The county assessor appraised its value, using the income approach, at $27 million. The assessor arrived at this figure after determining, from the best information available, the landfill's net income as well as other factors.

At a hearing before the Kenosha County Board of Review, Waste Management presented expert opinion that the operating landfill was comprised of a going concern value consisting of real estate, personal property and business value. Waste Management's position was that the assessor may only be concerned with real estate value. After deducting the personal property and business value, Waste Management argued that, based upon its experts' opinions, the true value lay between $2.3 million and $3.1 million. The board adopted the assessor's valuation and the trial court eventually confirmed the assessment. Waste Management appeals.

Waste Management's position is essentially as follows. The operation of a landfill requires using entrepreneurial skills, working capital, business acu-

men and expertise, ability to attract and hold customers, reputation for integrity and compliance with the laws, and investment for equipment and other values. All of these are factors which are not inherent in determining real property value. Instead, they are attributes of the operator of the landfill business. They have nothing to do with the value of the land but have to do with how successful that *particular* business entity is. The next person, running the same operation on the same land, may not do as well. So, it is error to consider all of the landfill's net operating income since it cannot be transferred to a "passive landowner." Waste Management cited evidence from its experts which would reduce the assessor's opinion of full market value by some eighty to ninety percent.

Waste Management argues that the assessor and the board of review violated the law by failing to deduct business value. Waste Management cites sec. 70.32(1), Stats., which requires assessors to consider all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed. This includes the WISCONSIN PROPERTY ASSESSMENT MANUAL (rev. 1992) (MANUAL). *See* sec. 70.32(1). According to Waste Management, the MANUAL requires assessors to exclude values of assets other than real property when using the income approach. We will discuss this aspect of Waste Management's argument later. Waste Management also cites a national encyclopedia on appraising which it claims is a primer on acceptable appraisal practices and which is therefore, by law, a source for whether the appraiser in this case made the correct assessment. Based upon this primer, Waste Management asserts that the assessment was improper. We will also discuss this later.

The board of review and Richard E. Ellison (hereinafter the assessor's office) take a different view. The assessor's office asserts that the right to profit from operating the landfill runs with the property. It points to Wisconsin landfill law saying that once an owner obtains a license for a landfill, and so long as all the rules are followed regarding the operation of landfills, a license *must* be given to the successor owner. It cites its expert's opinion that only after a site is operational do willing buyers and sellers of a landfill have any idea of the benefits that the operator is going to receive. At that point, the zoning has been determined, an income stream is being generated, people are traveling to the site, and the cost of operation and the profit generated are known.

The assessor's office then cites the oft repeated maxim that the assessor must compute the entire bundle of rights to the property. It points to facts in the record that the landfill is located in a place which has made it very popular for people to come to, that it is of modern design, and that it is far from being filled to capacity. It contends that the land is the engine driving these facts and is responsible for the revenues. It asserts that this land will generate the revenue for whomever owns it, business value aside. While the assessor's office acknowledges that a keen understanding of landfill operation is necessary for profits to continue, there is evidence that several businesses have that understanding such that, should they consider buying the property, it would be because the landfill itself is the going concern.

In deciding who is right, we point out our limited review. We may only inquire (1) whether the board of review kept within its jurisdiction; (2) whether it acted

according to law; (3) whether its decision was arbitrary, oppressive or unreasonable; and (4) whether there was evidence before the board as would reasonably support its determination. *Flood v. Village of Lomira Bd. of Review,* 153 Wis. 2d 428, 433, 451 N.W.2d 422, 424 (1990). Failure to make an assessment on the statutory basis is an error of law, correctable by the courts on certiorari. *See Darcel, Inc. v. City of Manitowoc Bd. of Review,* 137 Wis. 2d 623, 624, 405 N.W.2d 344, 344–45 (1987). Our scope of review is identical to the trial court's, and we conduct it independently of the trial court's conclusions. *Steenberg v. Town of Oakfield,* 167 Wis. 2d 566, 571, 482 N.W.2d 326, 327 (1992).

Regarding how we review the opinion of the assessor and the decision of the board, the standard is clear. The assessor's opinion is *prima facie* correct and is binding on the board of review in the absence of evidence showing it to be incorrect. *State ex rel. Kimberly-Clark Co. v. Williams,* 160 Wis. 648, 651, 152 N.W. 450, 451 (1915). Courts may not reverse a board of review decision if it can be supported by any reasonable view of the evidence. *State ex rel. Geipel v. City of Milwaukee,* 68 Wis. 2d 726, 732, 229 N.W.2d 585, 588 (1975). We presume that the decision is correct. *State ex rel. Bluemound Amusement Park, Inc. v. Mayor of Milwaukee,* 207 Wis. 199, 204, 240 N.W. 847, 849 (1932).

With the standard of review defined, we reach the merits. This is not the first time that a taxpayer has asserted the necessity of excluding "business value" from an assessment. This court recently dealt with the issue in *State ex rel. N/S Associates v. Board of Review,* 164 Wis. 2d 31, 473 N.W.2d 554 (Ct. App. 1991). *N/S*

*Associates* involved the assessment of the Southridge Mall. The mall had been sold for $114,000,000 in the fall of the previous year. The assessor raised the assessment to reflect the sales price. The taxpayer argued that the sales price was a poor indicator of the land's real value. The taxpayer asserted that the sales price included more than the land; it also included the "going concern value" built up by the previous owners. The taxpayer claimed that the true value of the land would be its replacement cost because a well-informed buyer will not pay any more for real property than the cost of constructing an equally desirable substitute property with like utility. *Id.* at 52–53, 473 N.W.2d at 562. Thus, the difference between the price paid for the mall and the replacement cost represents a nontaxable "going concern value."

This court rejected the argument. We noted that "[a]ssessable real property in Wisconsin includes not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto." *Id.* at 53, 473 N.W.2d at 562 (quoting sec. 70.03, Stats.). We additionally pointed out that location is an important criterion. We observed that real property shall be valued by the assessor at the full value which would ordinarily be obtained at a private sale. *N/S Associates*, 164 Wis. 2d at 53, 473 N.W.2d at 562.

We then reasoned that "[t]he key of the analysis is whether the value is appended to the property, and is thus transferable with the property, or whether it is, in effect, independent of the property so that the value either stays with the seller or dissipates upon the sale." *Id.* at 54, 473 N.W.2d at 562. We concluded that Southridge Mall's reason for being was to lease space to tenants and related activities such as trash disposal

and baby stroller rentals. *Id.* at 55, 473 N.W.2d at 563. This ability to lease space was a transferable value that could not be separated from the existence of the buildings and improvements. In other words, the buildings and improvements went hand-in-hand with leasing, just like a farm building and its improvements go hand-in-hand with the growing of crops. *Id.* Income-producing capacity was interrelated with the buildings. We concluded that the assessment "may include as a component of value the property's transferable income-producing capacity." *Id.*

The assessor's office contends *N/S Associates* means that the "business value" value exclusion is not recognized in Wisconsin. The board of review does not go that far. It reads *N/S Associates* to create a test whereby the interrelationship of the land to income is examined by the evidence produced before the board of review. If substantial evidence shows an interrelationship that cannot be separated, then "business value" is a proper component of the assessment.

Waste Management contends that *N/S Associates* is limited to cases involving an attempt to subtract the value of a recent arm's-length transaction by asserting "business value." Here, the argument concerning "business value" goes to the income approach, not to a recent transaction. Thus, Waste Management concludes that *N/S Associates* is not controlling here.

Waste Management asserts that to apply *N/S Associates* to cases involving the income approach would be contrary to Wisconsin law. Assessors in Wisconsin are required to follow the MANUAL. *See Flood*, 153 Wis. 2d at 434, 451 N.W.2d at 424. Waste Management contends that the MANUAL prohibits using values of assets other than real property when using the income approach. It cites the MANUAL in describing the

method for valuing farmland by the income approach. Waste Management contends that it specifically says that all non-real estate inputs must be subtracted when using the owner-operator method.[1]

In discussing the methods of valuing commercial real property by the income approach, Waste Management contends that the MANUAL refers to rentals and market or economic rent and cautions assessors that when using income from nonrental sources, such as laundry facilities, to be certain that such facilities are not double assessed and that "only the real estate is being valued and not the quality of management or goodwill." MANUAL at 9–5 to –19, –24. From these passages, Waste Management concludes that use of owner-operated income to value commercial property for *ad valorem* tax purposes is prohibited and that only estimated rental income or "imaginary leases" may be used to estimate the fair market value of real property using the income approach. Waste Management concludes that the MANUAL prohibits using the *N/S Associates* analysis when using the income approach.

We agree with the board of review and disagree with both the assessor's view of the case and Waste Management's reading of *N/S Associates. N/S Associates* is not a blanket rejection of the "business value" exclusion. Rather, each case must be analyzed to determine whether the business value is *appended* to the property as opposed to independent of it.

Thus, the *N/S Associates* court was easily able to distinguish a foreign jurisdiction case where a cable television franchise's business value was found to have been improperly included in an assessment. *N/S Associates*, 164 Wis. 2d at 54–55, 473 N.W.2d at 563.

---

[1] WISCONSIN PROPERTY ASSESSMENT MANUAL, 11–31 to –34 (rev. 1987).

Obviously, the success or failure of a cable television franchise had nothing to do with the land on which the franchise sat. The *N/S Associates* court was also able to distinguish another foreign jurisdiction case where an inn's business was built entirely upon the goodwill of its prior owners who " 'conceived, built and constantly managed' " the business over the years. *Id.* at 54, 473 N.W.2d at 563 (quoting *Madonna v. County of San Luis Obispo*, 39 Cal. App. 3d 57, 60 (1974)).

The holding of *N/S Associates* sets forth the guideline upon which we decide this case; that is, whether the value is interrelated to the property or is independent of it. *See N/S Associates*, 164 Wis. 2d at 55, 473 N.W.2d at 563. In using this guideline, we are also well instructed on how to use this test. We look for substantial evidence in the record from which we can decide whether the transferable value of the business is inextricably intertwined with the property. *Id.*

We see no different result because the *N/S Associates* case involved an attempt to subtract from an arm's-length transaction while this case concerns an attempt to subtract from an income approach. Again, we reiterate that the key is not what kind of approach was used, but whether the property and the business are so interrelated that income is a necessary component in valuing the real estate. As stated by the *N/S Associates* court, sec. 70.03, Stats., commands an assessment not only of all buildings, improvements and fixtures, but also all rights and privileges appertaining thereto. *N/S Associates*, 164 Wis. 2d at 55, 473 N.W.2d at 563. We also point out that the *N/S Associates* court specifically recognized, in footnote six of its opinion, that the income approach may be used to assess farm property. *Id.* at 55 n.6, 473 N.W.2d at 563.

This footnote relates to the *N/S Associates* court's idea that the leasing of mall space is to malls what crops are to farmland and is a tacit recognition that the income approach is viable. From this we conclude that the *N/S Associates* court was in no way limiting its opinion to arm's-length sales. We reject Waste Management's limited view of *N/S Associates*.

We further reject the assertion that the MANUAL prohibits using operator-owner revenue in pursuit of the income approach. While it is true that the MANUAL cautions assessors to be "careful to make sure that only the real estate is being valued and not the quality of management and goodwill,"[2] that statement must be read in the proper context. The MANUAL was referring to those businesses, like hotels and motels, where excellent management or poor management is the vehicle driving income capacity. *See* MANUAL at 9–23 to –24. The MANUAL did not speak to those instances where the income is interrelated to the real estate. Further, while the MANUAL does suggest that rental values be used when arriving at gross income using an income approach, again the suggestion must be read in context. The MANUAL was referring mainly to rental apartments. As to valuation of other specific commercial properties, the MANUAL says:

> It is impossible to cover all of the elements that affect each type of commercial property. Thus, this section is intended as a place of beginning for the assessor in valuing commercial property. There are other books and texts that discuss the valuation of these types of properties in more detail.

*Id.* at 9–19. From this passage, it is evident that the MANUAL did not dictate a certain procedure for cases

---

[2] MANUAL at 9–24.

where the income capacity is found to be interrelated with the land. Indeed, the MANUAL is silent on the subject. The writers of the MANUAL implied only that the manual is not the last word and that other texts should be used to cover certain situations.

There is evidence in the record that the procedure used by the assessor in this case followed a well-known treatise on the subject. In fact, that text was written by one of the experts for Waste Management, Robert L. Foreman. He wrote an article in the ENCYCLOPEDIA OF REAL ESTATE APPRAISING entitled "Appraisal of Sanitary Landfills." ENCYCLOPEDIA OF REAL ESTATE APPRAISING, ch. 50 at 1077 (E. Friedman 3d ed. 1978). It is relied upon by professionals in the field. In the first section of ch. 50, he writes:

> There appears to be little justification for applying the Cost Approach in estimating the value of a proposed sanitary landfill. *A private investor would purchase the parcel on the basis of the present worth of the potential income stream, and not on the basis of the cost to bring the site into operation.*

*Id.* at 1083 (emphasis added). Foreman's work and his testimony were that the only appropriate method of appraising a sanitary landfill is to arrive at the present worth of the income stream from the operation of the landfill over its remaining economic and physical life; then to add to this the present worth of the reversion after the site had been filled. We conclude that the MANUAL directs assessors to other texts and treatises when the MANUAL'S examples do not accurately fit certain specific commercial properties. The approach used by the assessor followed the advice of those texts. We hold that the MANUAL does not prohibit this, but rather

recommends it. We reject Waste Management's argument.[3]

Using *N/S Associates* as our guide, we now apply it to this case. We hold that there is substantial evidence supporting the interrelationship between the landfill and business value. There was evidence that Pheasant Run is located among populous municipalities, which promotes great demand. The landfill enjoys a bright future. It is early in the use of its current licensed void rather than at the end of the stage. The landfill is new and state of the art. Other potential buyers of sanitary landfills exist and possess the necessary skills to successfully operate the landfill. Although fill is already there and is filling at a faster rate than other area landfills, there is ample remaining acreage available for expansion. There is a solid and positive history of governmental regulatory compliance. A new owner of the landfill would be entitled to the "tipping fees" charged to trucks as they enter the landfill. All of this translates to an inference that the land itself provides the catalyst for generating revenue and the holder of the license for that property has the very important right to realize that revenue. It is part of the bundle of rights associated with the property.

Waste Management takes issue with this analysis of the record. It observes that a landfill license cannot

---

[3] Waste Management also reads *State ex rel. N/S Associates v. Board of Review*, 164 Wis. 2d 31, 473 N.W.2d 554 (Ct. App. 1991), to turn on the fact that experts in that case did not know how to separate business value from the purchase price paid. Here, Waste Management has produced expert testimony on how to separate business value when there has been no recent sale of the landfill property. We reject this argument as well. As we read *N/S Associates*, the proficiency of the experts had nothing to do with the rationale expressed in that case.

be sold by a property owner. Thus, it is possible for a parcel to be zoned for a landfill but the new owner may not be able to use it for such purpose because the owner does not qualify financially or on the basis of past record for a landfill license.

We do not agree. The law is that landfill licenses are personal to the licensee, must be reviewed annually and can only be transferred by the state after the new licensee meets the requirements of law. Sections 144.44(4) and 144.444, Stats. However, a license *must* be issued under sec. 144.444 if the new applicant meets all of the requirements specified in the previous license. The landfill license is not transferable to another site; it must stay with the site. The license itself has no value, but the fact that the site has withstood the annual review mandated by ch. 144, Stats., enhances the value.

In addition, we have already noted evidence in the record that there are other entities in the same business as Waste Management with the financial resources and good track record to qualify for the license on the subject property. These entities will pay for the real estate based on the enhanced value. Thus, the licensing structure tends to further the view that the real property and the going concern are interrelated instead of detracting from it.

Last, Waste Management contends that the method used by the assessor amounted to double taxation. The only evidence supporting this assertion is from Foreman, who testified that some amount should be deleted as a "return" to "iron." We presume that this iron is personal property. However, the record does not show what the personal property tax was for the iron.

Therefore, there exists no evidence from which a trier of fact could conclude that there was double taxation.[4]

*By the Court.*—Judgment affirmed.

---

[4] Arguments were made regarding other methods used by the appraiser in arriving at an assessment. Because we hold that the income approach was sufficient, we need not discuss any other method.