Mark A. FLOOD, Petitioner-Appellant,

v.

## VILLAGE OF LOMIRA, BOARD OF REVIEW, Respondent-Petitioner.

Supreme Court

*Nos. 88–0862, 88–0863. Argued January 5, 1990.—Decided February 22, 1990.*

(Also reported in 451 N.W.2d 422.)

For the respondent-petitioner there were briefs by *Michael P. Fortune* and *Colwin, Fortune, Colwin & English, S.C.,* Fond du Lac, and oral argument by *Michael P. Fortune.*

For the petitioner-appellant there was a brief by *George St. Peter, John A. St. Peter* and *Edgarton, Ondrasek, St. Peter, Petak and Massey,* Fond du Lac and oral argument by *George St. Peter.*

SHIRLEY S. ABRAHAMSON, J. This is a review of a decision of the court of appeals, *Flood v. Village of Lomira, Board of Review,* 149 Wis. 2d 220, 440 N.W.2d 575 (Ct. App. 1989), reversing a judgment of the

circuit court for Dodge county, Joseph E. Schultz, Judge. The circuit court affirmed the order of the village of Lomira board of review which sustained the assessor's valuation of Mark Flood's real property.

Flood challenges the board's assessment on two grounds: (1) The board relied solely on the sale price in determining market value, refusing to consider whether the seller's financing terms affected the sale price; and (2) the board assessed the property at six percent more than market value to reflect the equalized value of property established by the Department of Revenue pursuant to sec. 70.57, Stats. 1987–88.

Relying on *State ex rel. Flint v. Kenosha County Rev. Bd.,* 126 Wis. 2d 152, 376 N.W.2d 364 (Ct. App. 1985), the court of appeals reversed the circuit court's judgment, holding that the board of review did not comply with sec. 70.32(1) when it determined market value without considering whether the financing terms between the seller and buyer affected the sale price. The court of appeals also concluded that the property assessment at six percent more than market value violated sec. 70.32(1), which requires real property to be assessed at full value.

We affirm the decision of the court of appeals. We hold that when a seller finances the purchase of property, sec. 70.32(1) requires the board of review to consider whether the financing terms between the seller and buyer affected the price of the real property in determining market value. We also hold that sec. 70.32(1) proscribes assessing real property in excess of market value.

This case has been before the board of review twice, the circuit court twice and the court of appeals once. The facts in this case are undisputed, and we shall state the facts and the procedural chronology in summary form.

431

Flood purchased a mobile home park in September 1984 for $650,000. The seller financed the entire price through two fifteen-year mortgages. The first mortgage secured a note for $500,000 with a 10 percent interest rate; monthly payments on the note were to be applied to interest during the first year, then amortized over the remaining fourteen year term. The second mortgage secured a note for $150,000 with an interest rate of 15 percent; the note required payments of $22,500 in the first and second years and payments of $2,420 per month during the third through fifteenth years.

The board first set the market value of the mobile home park at $704,100 for the 1986 property tax assessment. Flood objected in circuit court, asserting among other arguments that the recent purchase price of the mobile home park was $650,000. The circuit court remanded the matter to the board. The board adjusted the 1986 and 1987 assessments to $689,000, calculated at the sale price of $650,000, plus an additional $39,000 representing an equalization adjustment to 106 percent.

At the second hearing before the board, Flood objected to the board's assessing the property at the sale price. Contending that the sale price reflected the seller's favorable financing terms, Flood argued that the assessor should make a cash equivalency adjustment to the sale price to assess the real property at market value. He submitted a report to the board prepared by a licensed real estate broker to support this position. The report concluded that Flood obtained a favorable financing package in exchange for paying a higher price for the real property and that the market value of the real property as determined by applying a cash equivalency analysis to the sale price was $490,000. The deputy assessor for the city of Madison testified on Flood's behalf before the board that cash equivalency adjustments were widely

accepted throughout the appraisal industry and had been applied in Madison since 1981.

Flood testified before the board that he had pur-chased five other mobile home parks around the state at about the same time as his purchase in Lomira. All the purchases had similar financing terms. All five proper-ties—located in Spooner, Rice Lake, Eden, Iron Ridge, and Ripon—were assessed using a cash equivalency adjustment.

The board refused to consider the alleged impact of the seller's financing arrangements on the price of the real property in determining full value for assessment purposes. Flood again sought relief from the board's assessment in the circuit court. This time the circuit court affirmed the decision of the board. The court of appeals reversed the order of the circuit court and remanded the case to the circuit court for remand to the board. The board of review petitioned this court for review.

■

A court's power to review on certiorari a board's determination of a real property assessment is limited. The court may review the board's determination to con-sider whether the evidence is sufficient and whether the board kept within its jurisdiction, acted according to law, or acted arbitrarily or in bad faith. *Darcel, Inc. v. Manitowoc Review Bd.,* 137 Wis. 2d 623, 625–26, 405 N.W.2d 344 (1987); *Dempze Cranberry Co. v. Biron Board of Review,* 143 Wis. 2d 879, 883–84, 422 N.W.2d 902 (Ct. App. 1988); *Rosen v. City of Milwaukee,* 72 Wis. 2d 653, 661–62, 242 N.W.2d 681 (1976); *State ex rel. Markarian v. Cudahy,* 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970).

In this case Flood asserts that the board has com-mitted an error of law. He contends that the board did

433

not comply with sec. 70.32(1) when it examined only the sale price to determine full value of the real property in this case.

Section 70.32(1), Stats. 1987–88, the statute governing the valuation of real property for the purposes of taxation, provides that the assessor shall value real property at the full value which could ordinarily be obtained therefor at a private sale. Section 70.32(1) further requires the assessor to value real property in the manner specified in the Wisconsin property assessment manual. Section 70.32(1) provides in part as follows:

> **70.32 Real estate, how valued. (1)** Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale.[1]

---

[1]Section 70.32(1), Stats. 1987–88, provides in full as follows:

(1)   Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value the assessor shall consider, as to each piece, its advantage or disadvantage of location, quality of soil, quantity of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value; but the fact that the extent and value of minerals or other valuable deposits in any parcel of land are unascertained shall not preclude the assessor from affixing to such parcel the value which could ordinarily be obtained therefor at private sale. If on the assessment date occurring in 1957 or in any year thereafter any person other than a governmental unit of Wisconsin owns real estate in which a governmental unit has retained mineral rights, timber rights or an easement or any similar interest in such real estate, the value of any such retained right shall be eliminated in determining the assessable value of such property, and such interest shall be excepted in the assessment description of

■

For the purposes of assessing real property, we have construed the statutory phrase "full value" to mean market value. The terms "full value," "market value" and "fair market value" are synonymous and interchangeable in the opinions. *Darcel, Inc. v. Manitowoc Review Bd.,* 137 Wis. 2d 623, 628, 405 N.W.2d 344 (1987); *State ex rel. Baker Mfg. Co. v. Evansville,* 261 Wis. 599, 608, 53 N.W.2d 795 (1952); Property Assessment Manual for Wisconsin Assessors, vol. 1, p. 7–3 (12/87), hereafter Manual.

The board contends that the court of appeals erred by requiring it to consider cash equivalency in valuing the real property in this case and argues for an assessment based solely on the sale price of the property. The board relies on numerous cases of this court declaring that the price at a recent arms-length sale is the best information of value and resort should not be made to other factors in determining the market value of the property. *State ex rel. Geipel v. Milwaukee,* 68 Wis. 2d 726, 735–37, 229 N.W.2d 585 (1975); *State ex rel. Lincoln Fireproof Warehouse v. Board of Review of Milwaukee,* 60 Wis. 2d 84, 98, 208 N.W.2d 380 (1973); *State ex rel. Markarian v. City of Cudahy,* 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970); *State ex rel. Enterprise Realty Co. v. Swiderski,* 269 Wis. 642, 645, 70 N.W.2d 34 (1955).

such land and in any notice, tax certificate or tax deed following from any such assessment.

According to sec. 73.03(2a), Stats. 1987–88, the Wisconsin property assessment manual 'shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level.'

The board recognizes, however, that the cases do not suggest that sale price is synonymous with the market value in all situations. This court has repeatedly emphasized that, in order for the sale price to be considered the best information of the market value of the property, the sale must be an arm's-length transaction. *Darcel, Inc. v. Manitowoc Review Bd.,* 137 Wis. 2d 623, 628, 405 N.W.2d 344 (1987). The court has defined an "arm's-length transaction" as a sale in the open market between an owner willing but not obliged to sell and a buyer willing but not obliged to buy. *Darcel, supra,* 137 Wis. 2d at 628.

In this case both parties characterize the sale as an arm's length transaction. The buyer and seller in this case were not related; no compulsion was present; both seller and buyer were knowledgeable about real estate.

The board maintains that once the court has determined that an arm's length transaction has occurred, there is no need to examine other factors surrounding the sale to determine whether the sale price represents market value.

Flood contends that courts have permitted inquiry into whether the sale price represents market value of the real property when the terms of the sale may have an effect on the sale price. He argues that the sale price in this case reflects both the full value of the real property and the value of the seller's favorable financing terms. Flood analogizes the transaction in this case to the sale of real property that includes the sale of personal property. When both real and personal property are sold, the sale price has to be adjusted downward for purposes of assessment of the real property to reflect that items other than real property were sold. Flood urges that the seller's favorable financing terms resulted in an

436

increased sale price and that this factor should be considered in the assessment process.

██

We agree with Flood that our cases have recognized that various circumstances in an arm's-length transaction may mean that the sale price is not the best information of the full value of the real property. For the sale price to be the best information of full value the sale must be made "under normal conditions" so as to lead to the conclusion that the price paid was that which could "ordinarily" be obtained for that property. *State ex rel. Evansville Merc. Asso. v. Evansville,* 1 Wis. 2d 40, 43–44, 82 N.W.2d 899 (1957). The taxpayer has the burden of showing that the sale was made "under normal conditions." *Geipel, supra,* 68 Wis. 2d at 734. See also *State ex rel. Collins v. Brown,* 225 Wis. 593, 275 N.W. 455 (1937).

In this case Flood has the burden of showing that the seller's favorable financing terms rendered this sale as one not made "under normal conditions."

The Property Assessment Manual for Wisconsin Assessors, to which sec. 70.32(1) expressly refers, advises assessors to examine the financing terms between the seller and buyer, as well as other circumstances of a sale, to determine whether the sale price is the best information of market value of the real property.[2] Wisconsin

---

[2]The Manual identifies the following six conditions an assessor must consider when determining whether a sale may be considered a market value transaction:

    1. It [the sale transaction] must have been exposed to the open market for a period of time typical of the turnover time for the type of property involved.

    2. It presumes that both the buyer and the seller are knowledgeable about the real estate market.

    3. It presumes buyer and seller are knowledgeable about the uses, present and potential, of the property.

courts have relied on the Manual frequently for guidance when interpreting and applying sec. 70.32(1), and both parties direct our attention to the Manual.

In terms similar to this court's definition of an arm's-length transaction, the Manual defines "market value" as " 'the highest price in terms of money which a property will bring in a competitive and open market under all conditions requisite to a fair sale.' " Manual, vol. 1 at 7-3 (12/87). The Manual advises that although the sale of property is the best indicator of market value, the assessor must carefully examine the circumstances surrounding each sale to determine whether the sale price may not be the best information of the full value. Manual, vol. 1, at 7-3 (12/87), vol. 2, at 21.3-3 (12/89).

The Manual explains that the best information of full market value would be an arm's length sale of the property paid for totally in cash. Although cash sales are rare, in most arm's-length sales of real property, a buyer obtains a loan from a disinterested third party such as a savings and loan institution or bank. In arm's-length sales made with loans from disinterested third parties the sale price usually reflects the market value of the real property, and the financing terms do not require that the sale price be adjusted to reflect financing. Manual, vol. 1, at 7-19-20 (12/87).[3]

---

4. It requires a willing buyer and a willing seller, with neither party compelled to act.

5. *Payment of the property is in cash, or typical or normal financing and payment arrangements prevalent in the market for the type of property involved.*

6. The sales price must include all of the rights, privileges, and benefits of the real estate. For rental property, this includes both the lessor's and the lessee's interests." Manual, vol. 1, p. 7-3 (12/87) (emphasis supplied).

[3]The Manual, vol. 1 at 7-20 (1987), explains that not every sale needs adjustment.

438

When a seller finances the transaction and the financing terms include interest below the market rate, the financing terms may, according to the Manual, influence the purchase price. The Manual states that under these circumstances the sale price may have been increased over market value to compensate the seller for the lower interest rate. The Manual advises an assessor to examine the financing terms between the seller and buyer to determine whether the sale price accurately reflects market value of the real property.

The Manual concludes that assessors should use a "cash equivalency adjustment" to ensure that the purchase price in an arm's length transaction with seller financing reflects the market value of the real property in the same way that the sale price in an arm's-length transaction not involving unique financing arrangements between the seller and buyer reflects market value. Manual, vol. 1, p. 7-22 (12/87). A cash equivalency adjustment is designed to reflect financing

Conditions of Sale Not Needing Adjustment

Not every sale needs adjustment. Nor does every condition of a sale need adjustment. It is important that the assessor realizes what elements or conditions of a sale are 'typical' of the market place and for which no adjustments need be made. It may be helpful to describe what a typical, or usual, transaction involves. A property owner lists the property with a real estate broker for a specific price. Either that broker or another broker produces a buyer who makes an offer at a price that is acceptable to the seller. This process may involve offers from several different buyers or offers and counteroffers between the buyer and the seller. The buyer agrees to pay a certain percentage of the sales price in cash and obtains the balance as a loan from a bank, savings and loan, credit union, or other third-party that is in the business of· making real estate loans. At the closing, the seller receives the money, pays a commission to the real estate broker, pays off any outstanding mortgages on the property, and keeps the balance. Unless there is some unusual circumstance connected with this transaction, the sales price should need no adjustment to be an indication of market value.

in the sale price. "The process of cash equivalency is," according to the Manual, vol. 1, p. 7–20 (12/87), "to analyze the transaction, to determine whether or not any of the financing conditions had an effect on the sales price, and to determine the amount that the sales price was affected. Cash equivalency assumes that through this process the transaction can be adjusted to take a cash amount that is indicative of market value."

Contrary to the board's assertion, considering a cash equivalency adjustment when a seller finances the sale is consistent with precedent. Like Flood and the court of appeals, we find *State ex rel. Flint v. Kenosha County Rev. Bd.,* 126 Wis. 2d 152, 376 N.W.2d 364 (Ct. App. 1985), which considered the effect of financing terms on sale price, apposite. In *Flint* the court of appeals held that when using the sales of comparable properties to determine their market value for assessing a taxpayer's property, the board of review must consider the effect of creative financing arrangements upon the sale price of the comparable property to establish the full value of that property. 126 Wis. 2d at 160.

The board attempts to distinguish *Flint* on the ground that in this case Flood seeks to apply the cash equivalency adjustment to the sale price of the property being assessed and not to comparable properties. We conclude, as did the court of appeals in this case, that the cash equivalency adjustment is applicable whether the analysis is of the market value of comparable property or the market value of the taxpayer's property.

Furthermore, our holding in this case is consistent with our holding in *Darcel, Inc. v. Manitowoc Bd. of Rev.,* 137 Wis. 2d 623, 405 N.W.2d 344 (1987). In *Darcel,* the court concluded that a board of review may not consider economic rents in assessments of a shop-

440

ping center because the market value of the real property had been established by a recent arm's-length sale. The *Darcel* court recognized, as we have, that an assessor must consider all factors relevant to the sale when determining whether the sale price resulted from an arm's-length transaction and is the best information of full value. The court explained:

> This court has previously held that it is error for an assessor to use other means to assess the value of property in the presence of an arms-length sale. However, this assessor did have a duty to determine if the sale was at arms-length and properly investigated further. While his investigation uncovered some 'red flags' that could have indicated an other-than-arms-length sale, these 'red flags' were later explained to the satisfaction of the circuit court, and did not appear to be the basis of the board's findings.
>
> The mere claim of an arms-length sales [sic] should not foreclose the assessor from further investigation to determine the nature of the sale. Only through investigation and comparison can an assessor determine if a sale is truly at arms-length. *Darcel,* 137 Wis. 2d at 629–30 (citations and notes omitted).

██

We conclude that a seller-financed purchase is one of the "red flags" an assessor and board should consider when determining whether a recent sale of the real property constitutes the best information of market value. Here the seller financed the sale at what Flood, the buyer, now characterizes as highly favorable financing terms not available on the open market. Flood contends that the purchase price exceeded the market value of the real property to reflect these favorable financing terms. We hold that the board should, pursuant to sec. 70.32(1),

review the financing terms to determine whether Flood's position has merit.

We express no opinion whether a cash equivalency approach to valuation provides a better measure of the full value of Flood's real property than the sale price, and we do not determine the market value of Flood's real property. These are determinations for the board of review. We simply conclude that, under the circumstances of this sale, the board may conclude that the sale price is not the best information of full value and that sec. 70.32(1) requires the board of review to consider, for purposes of determining the full value of Flood's real property, whether the financing terms affected the price Flood paid.

The board contends that using cash equivalency would violate Article VIII, sec. I of the Wisconsin Constitution, which requires that "the rule of taxation shall be uniform . . .." The board suggests that by considering the financing terms between the seller and buyer the valuation of real property would be based on financing terms rather than sale price and would not be uniform. We disagree with the board. As described in the Manual, the purpose of the cash equivalency adjustment is to evaluate financing arrangements between the buyer and seller against the backdrop of financing terms available from disinterested third parties on the open market. By considering financing terms when the seller finances the purchase, the assessor adjusts the sale prices in those transactions in which the sale price may reflect the financing arrangements. We conclude that this practice is not contrary to the Wisconsin Constitution.

The board also contends that the court of appeals erred when it set aside the six percent the board added to the sale price to calculate full market value. The addi-

442

tional six percent figure is derived from the village of Lomira's equalization valuation which is the state Department of Revenue's independent evaluation of the total value of property within a municipality. Section 70.57(1), Stats. 1987–88.

The Department of Revenue's equalized value is not, according to the Manual, a measure of market value of a particular parcel within a municipality; it is a test of the local assessor's overall valuation. The basic difference between equalized value and assessed value is that the Department is concerned with equity among municipalities, whereas the local assessor is concerned with the equity among individual property assessments. Manual, vol. 1 at 1–12 (12/87).

The board asserts that the practice of assessing real property above its full market value is authorized by *Fontana v. Village of Fontana-on-Geneva Lake,* 107 Wis. 2d 227, 319 N.W.2d 900 (Ct. App. 1982). We conclude that *Fontana* does not advance the board's cause. First, *Fontana* involved assessing real property at less than market value, not in excess of market value. Second, the propriety of assessing the property at less than market value apparently was not an issue in the *Fontana* case and is not discussed in the opinion. The court's recitation of the facts in the *Fontana* case merely includes the statement that property in Fontana was assessed at 80 percent of market value. 107 Wis. 2d at 229. The briefs in *Fontana* refer to an assessor's affidavit that the property in the village is assessed at 80 percent of market value. Finally, as the court of appeals observed in this case, there is no evidence in the record that the property in Lomira is assessed at 106 percent of full value. We therefore do not view the *Fontana* case as supporting the board's position in this case.

As the court of appeals ably stated in its opinion, for over a century this court has interpreted the statutes as requiring localities to assess property at 100 percent of market value. *Flood, supra,* 149 Wis. 2d at 226–27. We adhere to the conclusion the court of appeals reached in *State ex rel. Kesselman v. Sturtevant,* 133 Wis. 2d 122, 132, 394 N.W.2d 745 (Ct. App. 1986):

> We are aware of no authority in the statutes or the assessment manual for use of equalized value by a local assessor in estimating fair market value of a particular parcel for property tax assessment purposes. The [assessment] manual, in fact, stresses [that] the equalization is concerned with equity between municipalities, while local assessor's concern is properly with equity among individual property assessments. The assessor is required to assess property based on fair market value. (Citations omitted.)

We conclude, as did the court of appeals, that the board's assessment of this property at 106 percent of what it determined to be the market value of Flood's property violates sec. 70.32(1) and must be set aside.

For the reasons set forth, we affirm the judgment of the court of appeals and remand this case to the circuit court with instructions to remand to the board of review of the Village of Lomira for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is affirmed and the case is remanded to the circuit court with instructions to remand to the board of review of the Village of Lomira for further proceedings consistent with this opinion.