METROPOLITAN HOLDING COMPANY, a general partnership, Petitioner-Appellant,†

v.

BOARD OF REVIEW OF the CITY OF MILWAUKEE, WISCONSIN, Respondent.

Court of Appeals

*No. 90-2748. Submitted on briefs July 2, 1991.—Decided February 4, 1992.*

(Also reported in 482 N.W.2d 654.)

†Petition to review granted.

135

For the petitioner-appellant the cause was submitted on the briefs of *Weiss, Berzowski, Brady & Donahue* by *F. Patrick Matthews, Andrea Roschke and Alan Marcuvitz,* of counsel, Milwaukee.

For the respondent the cause was submitted on the briefs of *Grant F. Langley,* City Attorney, by *Kathryn M. West,* Assistant City Attorney, of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

MOSER, P.J. Metropolitan Holding Company (Metro), a partnership, appeals from a trial court denial of a certiorari review affirming the City of Milwaukee Board of Review's (Board) affirmance of the city tax assessor's valuation of Metro's property for city real property tax assessment purposes, effective January 1, 1988. The parties disagree as to the correct method of assessment for the Layton Garden Addition, a federally subsidized low-income elderly housing project. Metro asserts that a capitalization of income method based upon actual income and expenses is correct while the Board supports use of a capitalization of income based upon estimated market rents. The Board approved a total assessment of $4.483 million, valuing the land at $.711 million and improvements at $3.772 million; this reduced the assessor's total valuation of $4.766 million. Metro, in contrast, used the "Property's actual income and expenses" as a basis for the capitalization of income approach to assessment, calculating a total assessed value of $1.713 million.

Testimony before the Board shows the following facts. Layton Garden consists of three buildings, each containing seventy-eight one-bedroom apartment units and one two-bedroom unit, the latter of which is utilized by building managers. Layton Garden was built in 1972–73. It was, and is, financed under the Federal Housing Authority 236 program as low-rent elderly housing. The record reflects that Metro paid a ten-percent construction downpayment and in return obtained low-interest forty-year mortgages through the federal Housing and Urban Development Authority (HUD). The apartment buildings were constructed according to HUD regulations and/or restrictions. In addition, Metro and HUD agreed that Metro would rent the premises at below-market contract rentals (approximately $230 per

137

month). The elderly tenants generally pay thirty percent of the monthly rental and HUD pays the balance. HUD regulations further limit Metro's income to $6,000 per year over expenses for each building, any overage reverting to HUD. An additional restriction on the owners is that the tenants can only be removed for cause—cause being nonpayment of rent or waste. Removal of a tenant is further controlled by HUD regulations. Under the terms of the mortgage and HUD regulations, the owners may pre-pay the mortgage after twenty years (1993 in this case), thereby freeing the property from all HUD restrictions and allowing the owners to charge market rents. However, a federal congressional moratorium has been imposed on this part of the agreement.[1] Neither side contests the fact that under HUD regulations, real estate taxes are an expense of operating subsidized housing that is considered in determining rental charges.

Both sides to this appeal agree to the following facts. First, the highest and best use of this property is residential rental units. Second, there is no active market for the sale of such properties, because of the federal servitudes on low-rent federally subsidized housing units. It follows that since there was no recent arms-length sale of this or comparable properties to provide the best information available for tax assessment purposes, a recent sale or comparable sales basis could not be employed in this instance.[2] Third, the cost evaluation method is not proper for use in this tax assessment period although it is uncontroverted in the record that the cost of replacement for these buildings is approximately $5.5 million. Fourth, neither side contests the

---

[1]*See* Emergency Low Income Housing Preservation Act of 1987 § 221, 12 U.S.C.A. § 1715*l* (1989).

[2]*See State ex rel. Markarian v. City of Cudahy,* 45 Wis. 2d 683, 687, 173 N.W.2d 627, 630 (1970).

historical fact that Metro insured these three premises for fire and casualty insurance in the amount of $4.384 million (replacement) at the time of the controverted January 1, 1988 assessment. Finally, the parties agree that the capitalization of income approach to tax assessment valuation is the proper method to apply. The difference between the parties is the basis upon which to calculate the relevant income. Metro does not contest the *amount* of comparable economic or market rents obtained, through an examination of south side City of Milwaukee multiple rental units, by the City assessor for his valuation; it does, however, contest the *use* of these values to arrive at the assessment valuation of the property.

Metro's valuation was predicated on the actual, or contract, rents with HUD. This valuation was made by Keith Munson, the President of National Appraisal Corporation, a state certified appraiser II, and assessor for a number of municipalities in southeastern Wisconsin. The record reflects that in Milwaukee County he was the assessor for the Villages of Fox Point, Bayside, River Hills, Hales Corners; in Waukesha County, for the cities of Oconomowoc and Delafield and the Town of Genesee; and in Racine County, for the City of Burlington and the Villages of Wind Point and Union Grove. Munson has previously been involved in the assessment of one subsidized housing property in Burlington, Wisconsin, in which the capitalization of income calculation, based upon economic or market rents, was used because the contract rents were very close to actual market rents.

The Board found that the city assessor correctly followed the statutory mandate[3] and valued the subsi-

---

[3]*See* sec. 70.32(1), Stats. "Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual . . .."

dized housing by employing the income approach using comparable economic rents as required by the Wisconsin property assessment manual (Assessment Manual).[4] In its written Findings of Fact and Determination[5] approving the valuation of the city's assessor, the Board relied upon the method specified in the Assessment Manual, pursuant to sec. 70.32(1), Stats. The Assessment Manual expressly states that "subsidized housing must be valued according to the value it would command if it were free and clear of encumbrances"[6] and that when the income approach is used "for the valuation of subsidized housing, *market rents* must be used, regardless of whether the contract rents are above or below market rent."[7] The Board further found that Metro's appraisal used the contract rents in its income approach valuation and did not overcome the presumption that the Milwaukee Board of Assessors' valuation was correct.[8] It therefore sustained the assessors' valuation of the three apartment units as noted above.

Metro petitioned the circuit court for certiorari review of the Board's assessment;[9] the petition was denied. On appeal, Metro raises a number of claimed errors that relate to one dispositive issue: the use of market rents as opposed to contract rents in calculation of assessed value using the income capitalization

---

[4]*See* sec. 73.03(2a), Stats.; *see also* 1 *Property Assessment Manual for Wisconsin Assessors* (1980) at 9–24 to 9–25 (full text provided in the appendix to this decision).

[5]An excerpt of the Board's decision is provided in the appendix to this decision.

[6]1 *Assessment Manual* at 9–25.

[7]*Id.* (emphasis added).

[8]*See State ex rel. Mitchell Aero, Inc. v. Board of Review,* 74 Wis. 2d 268, 283, 246 N.W.2d 521, 528–29 (1976).

[9]*See* sec. 70.47(16)(a), Stats.

approach.[10] Metro frames this issue as whether the Board's assessment is arbitrary because it is based on the directions found in the Assessment Manual created by the Department of Revenue and whether the Assessment Manual violates the tax uniformity clause found in the Wisconsin Constitution and fails to follow the Wisconsin tax statutes.[11]

In the context of this case we first look to see whether the assessment procedure for subsidized housing[12] set forth in the Assessment Manual comports with the Wisconsin Constitution's uniformity clause,[13] the statutes involved and judicial decisions interpreting these statutes.[14] We then determine if the actual assessment in fact follows the assessment procedure. These are questions of law reviewed independently of the Board's

---

[10]Metro also asserts that it was error for the Board to admit into evidence *State ex rel. Arrowhead Village La Crosse Ltd. v. Board of Review,* No. 86-0447 (Wis. Ct. App. Sept. 24, 1987), an unpublished decision concerning the assessment of federally subsidized housing. Citation of unpublished decisions does not inevitably lead to reversible error. *See State v. Higginbotham,* 162 Wis. 2d 978, 997, 471 N.W.2d 24, 32 (1991) ("Section 809.23(3), Stats., by its express terms, only forbids the citation of unpublished opinions 'as precedent or authority.' " (footnote omitted)). We hold that although it was error to admit *Arrowhead Village* into evidence, *see* sec. 809.23(3), the error was harmless because the record does not indicate that the Board relied upon this decision rather than its own judgment. Thus, Metro was not in fact prejudiced by this erroneous admission. *See Sumnicht v. Toyota Motor Sales, U.S.A.,* 121 Wis. 2d 338, 376-77, 360 N.W.2d 1, 19-20 (1984).

[11]*See* sec. 70.32(1), Stats.

[12]1 *Assessment Manual* at 9-24 and 9-25 (revised 12/87).

[13]Wis. Const. art. VIII, sec. 1.

[14]*See* secs. 70.32(1) and 73.03(2a), Stats.

determination.[15]

## RELEVANT TEXT OF

## CONSTITUTION, STATUTES and ASSESSMENT MANUAL

The uniformity clause of the Wisconsin Constitution states: "The rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods."[16]

Section 70.32(1), Stats., mandates that the method by which Wisconsin property is assessed shall be set forth in a specific document, the Wisconsin property assessment manual: "Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." Section 73.03, Stats., which sets forth the "power and authority" of the department, in subsection (2a) directs the department:

> To prepare, have published and distribute to each county having a county assessor system under s. 70.99 and to each town, city and village in the state for the use of assessors, assessment personnel and the public detailed assessment manuals . . .. [which] shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assess-

[15]*See State ex rel. N/S Assocs. v. Board of Review,* 164 Wis. 2d 31, 41–42, 473 N.W.2d 554, 557 (Ct. App. 1991).

[16]Wis. Const. art. VIII, sec. 1.

ments of property at the local level. The manual shall be amended by the department from time to time to reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information deemed valuable to local assessors by the department.[17]

In response to this statutory directive, the department of revenue has provided "standards, procedures, and guidelines to be followed by all assessing officials in the assessment of general property in the State of Wisconsin."[18] The Assessment Manual directs assessors to use "the best data available to arrive at an assessment,"[19] specifying the use of market rents when the income approach is appropriate for valuation of subsidized housing, "regardless of whether the contract rents are above or below market rent."[20] The rationale for the decision to utilize market, rather than contract rentals, derives from the view that "[t]he entire property, including all interests in it, is assessed to the owner of the property. . . . The Legislature has not empowered assessors to assess leasehold interests against lessees and so divide up property for purposes of taxation."[21]

## CONSTITUTIONALITY OF THE ASSESSMENT MANUAL

Metro argues that the method of assessment found in the manual promulgating agency rules pursuant to

---

[17]Sec. 73.03(2a), Stats.

[18]1 *Assessment Manual* at Introduction (first unnumbered page) (revised 12/85).

[19]1 *Assessment Manual* at 9–25.

[20]*Id.* The full text of this section is provided in the appendix to this decision.

[21]*Id.* (citing a Revenue Department Legal Opinion, March 12, 1982).

statutory authority, in the form of instructions to assessors, is in conflict with the uniformity clause of the state constitution because that manual requires federally subsidized housing to be assessed differently from all other real estate.

We first note that the Assessment Manual is an authority upon which assessors must rely when assessing property; failure to follow the provisions of the manual constitutes grounds for removal of an assessor from office by the circuit court.[22] This court defers to the legislature's "express[ion of] its confidence in the department's expertise" as set forth in the Assessment Manual.[23]

■■■■

To succeed, Metro's argument must overcome an admittedly heavy burden: the presumption of constitutionality accorded to legislative enactments. Tax statutes and government agency regulations, such as this assessment formulation for federally subsidized housing, are presumed to be constitutional.[24] The party challenging constitutionality, in order to prevail, must do so by

[22]*Flood v. Village of Lomira, Bd. of Review,* 149 Wis. 2d 220, 227, 440 N.W.2d 575, 578 (Ct. App. 1989) (hereinafter *Flood I)* (citing sec. 17.14(1)(g), Stats.), *aff'd,* 153 Wis. 2d 428, 451 N.W.2d 422 (1990) (hereinafter *Flood II).*

[23]*TDS Realestate Investment Corp. v. City of Madison,* 151 Wis. 2d 530, 540, 445 N.W.2d 53, 57 (Ct. App. 1989).

[24]*See Madison Gen. Hospital Ass'n v. City of Madison,* 92 Wis. 2d 125, 130, 284 N.W.2d 603, 605 (1979) ("The burden of showing a tax statute unconstitutional is the same as the burden which must be assumed when challenging the constitutionality of any legislative enactment."); *Richards v. Cullen,* 150 Wis. 2d 935, 938, 442 N.W.2d 574, 575 (Ct. App. 1989) (presumed constitutionality of legislative enactments applies to administrative rulings).

proof beyond a reasonable doubt.[25] "Only if the challenger shows that the [tax] classification is arbitrary and has no reasonable purpose will a legislative classification fall."[26] Merely establishing an element of doubt is insufficient to meet the "beyond the reasonable doubt" standard because courts "indulge[] every presumption and will sustain the law if at all possible."[27] We find Metro's argument unpersuasive for the following reasons.

First, the text of the uniformity clause, standing alone, belies Metro's interpretation because it specifically allows local governments to assess different kinds of real estate separately as long as all property of a specific class is assessed uniformly. Said another way, "all property within a class 'must be taxed on a basis of equality as far as practicable.' "[28] A tax classification which has a reasonable relation to a legitimate governmental purpose is permissible.[29]

Second, the Wisconsin Supreme Court has held that tax statutes, to meet the constitutional uniformity requirement, are in general governed by the following principles relevant to this decision:

[25]*Quinn v. Town of Dodgeville*, 122 Wis. 2d 570, 577, 364 N.W.2d 149, 154 (1985).

[26]*Woodward Communications, Inc. v. DOR*, 143 Wis. 2d 512, 523, 422 N.W.2d 137, 141 (Ct. App. 1988) (citing *Department of Revenue v. Moebius Printing Co.*, 89 Wis. 2d 610, 625, 279 N.W.2d 213, 219 (1979)).

[27]*Woodward Communications*, 143 Wis. 2d at 523, 422 N.W.2d at 141-42 (quoting *Quinn*, 122 Wis. 2d at 577, 364 N.W.2d at 154).

[28]*State ex rel. Hensel v. Town of Wilson*, 55 Wis. 2d 101, 106, 197 N.W.2d 794, 796 (1972) (quoting *Gottlieb v. City of Milwaukee*, 33 Wis. 2d 408, 424, 147 N.W.2d 633, 641 (1967)).

[29]*Madison Gen. Hospital*, 92 Wis. 2d at 129-30, 284 N.W.2d at 605 (classification of non-profit hospital).

1. For direct taxation of property, under the uniformity rule there can be but one constitutional class.

2. All within that class must be taxed on a basis of equality so far as practicable and all property taxed must bear its burden equally on an *ad valorem* basis.

. . ..

5. While there can be no classification of property for different rules or rates of property taxation, the legislature can classify as between property that is to be taxed and that which is to be wholly exempt, and the test of such classification is reasonableness.

6. There can be variations in the mechanics of property assessment or tax imposition so long as the resulting taxation shall be borne with as nearly as practicable equality on an *ad valorem* basis with other taxable property.[30]

With respect to these criteria, the Wisconsin appellate courts have recognized that financing arrangements affect the sales price of either the subject property[31] or of comparable properties.[32] In such instances, the courts have advised the boards of review that for valuation to be used in either assessment or comparison, the sales price of property must be adjusted to reflect the effect of particular financing arrangements.[33] Our decision in this case thus merely applies the same principle, i.e., consideration of the effects of financing, to valuation when the method used is capitalization of income.

---

[30]*Gottlieb v. City of Milwaukee,* 33 Wis. 2d 408, 424, 147 N.W.2d 633, 641–42 (1967).

[31]*Flood II,* 153 Wis. 2d at 431, 451 N.W.2d at 423.

[32]*State ex rel. Flint Building Co. v. Kenosha County Bd. of Rev.,* 126 Wis. 2d 152, 154, 376 N.W.2d 364, 365 (Ct. App. 1985).

[33]*Flood II,* 153 Wis. 2d at 431, 451 N.W.2d at 423; *Flint,* 126 Wis. 2d at 154, 376 N.W.2d at 365.

■

For these reasons, we hold that the method of assessment set forth in the Assessment Manual comports with the Wisconsin Constitution, statutes and judicial authority.

## ACTUAL METHOD COMPORTS TO ASSESS-MENT MANUAL

■

We now review the Board's decision to uphold the assessment. Appellate review on certiorari is limited to consideration of whether the Board kept within its jurisdiction, acted according to law, or acted arbitrarily or in bad faith, and whether the evidence before the Board was such that it might reasonably sustain the assessment.[34] Metro asserts only that the Board's decision to affirm the assessment was arbitrary; we thus address only this element of the test applied to certiorari review.

In this case, the Board considered the classification of the Layton Garden buildings. It noted there was no recent sale of this development. It also noted that there were no comparable sales of federally subsidized units. The Board further noted that both parties properly employed the income approach with some variations concerning vacancy rates, expenses and capitalization rates. Thus, the Board articulated its consideration of the various assessment methods set forth by the department of revenue in the Assessment Manual. Furthermore, the Board correctly identified the most significant difference between the two parties' approaches: the use of contract rents by Metro's appraiser, compared to the city assessor's use of comparable fair market rents.

---

[34]*See Flood II,* 153 Wis. 2d at 433, 451 N.W.2d at 424.

██ The Board took particular note that Metro's valuation was based upon contract rents, correctly rejecting that valuation as a direct contradiction of the mandate of sec. 70.32(1), Stats., which requires real property to be valued by the assessor in the manner specified in the Assessment Manual. The Board then went on to point out that the Assessment Manual requires an assessment of federally subsidized housing as if it were free from all federal restrictions, using market rents. The Board then found that the use of economic or market rents is appropriate and that the specific comparable market rents used in the city's assessment were supported by the evidence and not contradicted by Metro. The Board also found that the assessor's other calculations employed in arriving at the value of the property via the income method comported with the Assessment Manual. It then found that Metro had failed to overcome the presumption of validity of the correctness of the assessor's valuation method. The Board then concluded that the assessor's valuation of the property was correct. We hold that in this detailed consideration of the relevant facts in light of the correct legal rules, there was no arbitrary action of the Board. The decision clearly reflects the judgment of the Board, not its will.

██ To summarize, we hold that the Board's affirmation of the assessor's use of market rents to establish the full value for tax purposes of this subsidized housing project was made on the "best information available" and thus the constitutional requirement of uniformity is met and the property squarely pays its equal share of the costs incident to operation of the municipal government as required under the *Gottlieb* criteria. We are bound by the plain language of the assessor statute and the previous

decisions of this court[35] which state that assessors in Wisconsin must employ the procedures of evaluation described in the Assessment Manual promulgated by the Department of Revenue.[36] We further hold that there is no conflict between the assessment methods described in the Assessment Manual and sec. 70.32(1), Stats.

We therefore affirm the trial court's upholding of the Board's January 1, 1988, assessment of this property by denying certiorari because this decision of the Board comported with the methods of assessment formulated in the manual, the tax statutes,[37] and the uniformity clause of the Wisconsin constitution and was not arbitrary.

*By the Court.*—Order affirmed.

## APPENDIX

Excerpt from the
Findings of Fact and Decision,
Board of Review,
City of Milwaukee
July 14, 1989

However, the taxpayer's contention that the actual contract rents should be used in calculating an income based valuation is not supported by law. Sec. 70.32(1) Wis. Stats., provides that "real property *shall* be valued by the

---

[35]*In re Court of Appeals,* 82 Wis. 2d 369, 371, 263 N.W.2d 149, 149-50 (1978).

[36]Section 17.14(1)(g), Stats., provides for the removal of assessors who fail to follow the mandates of the *Assessment Manual* as required under secs. 70.32(1) and 73.03(2a), Stats.; *see also Flood I,* 149 Wis. 2d at 227, 440 N.W.2d at 578; *TDS Realestate,* 151 Wis. 2d at 539-40, 445 N.W.2d at 57.

[37]I.e., sec. 70.32(1), Stats.

assessor in the manner specified in the Wisconsin Property Assessment Manual . . ." (emphasis added).

Pages 9-24 and 9-25 of the *Property Assessment Manual for Wisconsin Assessors* cover valuation of federally subsidized housing. This section of the manual explicitly requires assessors to value subsidized property as though it were free from federal restrictions. The section provides, in excerpted part:

> *Subsidized housing must be valued according to the value it would command if it were free and clear of encumbrances. That is, as if it were fee simple, subject only to the limitations of taxation, police power, escheat, and eminent domain.*
>
> *When using the income approach for the valuation of subsidized housing, market rents must be used, regardless of whether [sic] contract rents are above or below market rent. When determining market rents, the assessor seeks to establish the rent that a tenant, utilizing the property to its highest and best use, is warranted in paying.*

(at p. 9-25)

The entire contents of the Manual at pp. 9-24 and 9-25 demonstrate a clear recognition on the part of the Department of Revenue of what it requires of assessors faced with valuing federally subsidized housing. They must assess the property based upon all of its inherent rights, including those rights which have been transferred for the duration of the HUD contract. Absent regulation or legislation to the contrary, a City assessor has a duty to value subsidized property as the Manual currently directs.

Therefore, the Board of Review finds that the use of market rents in assessing this property is appropriate.

150

The specific market rents which the City used in the income valuation of the property were adequately supported by the rent comparables presented and were not contradicted by the taxpayer.

The Board also finds that the other calculations used by the City in its income approach to valuation are supportable and were made according to the Wisconsin Property Assessment Manual. The testimony and other evidence provided by the owner did not overcome the presumption that the Board of Assessors' valuation is correct.

Excerpt from
1 *Property Assessment Manual for Wisconsin Assessors* (1980)
pages 9–24 to 9–25 (revised 12/87)

## FEDERALLY SUBSIDIZED HOUSING

The purpose of subsidized housing, as defined by the Department of Housing and Urban Development (HUD) is to assist low income families in renting decent, safe, and sanitary housing of modest design with suitable amenities. In a subsidized housing project, the tenant pays rent that is less than market rent. This lower rent is available either because the mortgage on the project is subsidized by the Department of Housing and Urban Development or because HUD makes monthly payments to the landlord on behalf of the tenant. Subsidized housing is regulated by the federal government with limitations on the contract rents, replacement costs, and amenities of such housing. These limitations are intended to permit production of suitable housing without excessive costs, design factors, or amenities. Some of the controls imposed by HUD on subsidized housing projects include:

1. At least 30% of the families in all projects must be very low income families as defined by HUD.

2. The owner must maintain the subsidized units in safe, sanitary, and decent condition. HUD performs routine inspections to ensure that these standards are maintained.

3. HUD must approve the terms and conditions of financing for the project.

4. The project must comply with HUD minimum property standards. All building plans must be approved by HUD.

5. HUD must approve the site for any subsidized housing project. The site must be adequate in terms of size, contour, exposure, utilities, and streets to accommodate the number and type of units proposed. The site must also be free from adverse environmental conditions (i.e., flooding, pollution, vermin, etc.) and accessible to social, recreational, educational, commercial, and health facilities.

6. Contract rents must compare reasonably to the rents of comparable unassisted units. Rents may exceed those determined by market comparison by no more than 20% and only when warranted by cost and expense data.

7. Marketing of units must meet the HUD approved Affirmative Fair Housing Marketing plan.

8. The property owner must submit audited financial reports to HUD each fiscal year and any other statements that HUD may require.

In addition to all of these requirements, HUD also regulates areas such as tenant selection, lease requirements, security deposits, management, maintenance, eviction, and rent adjustments.

The limitations and regulations for subsidized housing are spelled out in more detail in the Code of Federal Regulations, the Housing Assistance Payment Contract, and the Annual Contributions Contract between HUD and the property owner. HUD can grant exceptions to these limitations and requirements.

When a property owner enters into a contract with HUD, the contractual limitations become encumbrances on the title for the duration of the contract. The property owner is unable to sell the property as if it were free and clear of encumbrances. Such a project has to be sold as a subsidized project with all federally imposed restrictions adhered to by the purchaser. In addition, the owner of a project may not sell, transfer, or make any assignment of the contract without the prior consent of the Housing Authority. As a result, there are few arm's-length sales of subsidized housing projects.

Recognizing that the federal government does have an interest in the property for the duration of the contract, questions have been raised as to whether subsidy projects would qualify for a partial exemption based on that interest. Legal counsel of the Department of Revenue has held that there is no authority for treating part of the property as exempt based on ownership by the federal government (Revenue Department Legal Opinion—March 12, 1982). The opinion states: "The entire property, including all interests in it, is assessed to the owner of the property. The rights of any person claiming an interest in the property subordinate to the fee, whether under lease, contract or otherwise, would be

153

extinguished by a tax sale. The Legislature has not empowered assessors to assess leasehold interests against lessees and so divide up property for purposes of taxation."

Subsidized housing must be valued according to the value it would command if it were free and clear of encumbrances. That is, as if it were fee simple, subject only to the limitations of taxation, police power, escheat, and eminent domain.

Such projects must also be valued as if available to be put to the highest and best use. This will necessitate a thorough investigation of the highest and best use of the property as of the assessment date.

The highest and best use is that use which is probable, reasonable, and legal and will support the highest present value of the property. In addition to the present use, other uses to which the property may be adaptable must be considered. These alternate uses may have an effect on the market value of the property if the uses are legally permissible and financially feasible.

Given that such projects are to be valued as if unencumbered and available to be put to the highest and best use, the assessor would then proceed to use the best data available to arrive at an assessment. This would include consideration of the market, cost, and income approaches to value.

Where there are sales of subsidized housing projects, the sales must be analyzed to determine if they meet the criteria of market value. Such sales may be of a distressed nature and will include restrictions on the fee. As such, they cannot be relied upon when estimating market value. The assessor is not restricted to the use of only sales of subsidized housing to arrive at market value.

Sales of comparable conventional apartment projects can be used, with adjustments made for differences in physical attributes and amenities. If a subsidized housing project were unencumbered, it would be conventional housing.

When using the cost approach, the assessor must be aware that as a result of the regulations and restrictions on subsidized housing, the projects will have a higher per unit cost than conventional projects. This is due to higher labor costs required by federal pay regulations and higher construction costs resulting from federal building regulations which are more strict than local regulations. CAUTION: Cost is not necessarily equal to value. The added expense of meeting the federal building regulations will not generally cause the market value of such a project to increase by the same amount. The assessor must determine what additional value, if any, results from the expenditure of additional funds to meet federal building regulations.

When using the income approach for the valuation of subsidized housing, market rents must be used, regardless of whether the contract rents are above or below market rent. When determining market rents, the assessor seeks to establish the rent that a tenant, utilizing the property to its highest and best use, is warranted in paying.

When analyzing data for the income approach, the assessor will find that operating expenses for subsidy projects are higher than those on conventional apartment projects due to reporting requirements and services beyond those required in the typical rental project. The operating expenses used in the income approach must be based on market data which reflects the actual experience of competitive conventional apartment projects.

155

FINE, J. *(dissenting)*. The assessment of real property is governed by statute:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, *at the full value which could ordinarily be obtained therefor at private sale.*

Section 70.32(1), Stats. (emphasis added). As we recently recognized:

> "Full value," as that term is used in section 70.32(1), is "fair market value," which is "the amount [a parcel of property] will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *See State ex rel. Mitchell Aero, Inc. v. Board of Review,* 74 Wis. 2d 268, 277, 246 N.W.2d 521, 526 (1976); 1 *Property Assessment Manual for Wisconsin Assessors* 7–3 (Rev. 12/87).

*State ex rel. N/S Associates v. Board of Review,* 164 Wis. 2d 31, 42–43, 473 N.W.2d 554, 558 (Ct. App. 1991). Thus, for example, the assessment of a country-club facility had to take into account that the property "could not be sold as a golf course" but, rather, as farm land. *State ex rel. Oshkosh Country Club v. Petrick,* 172 Wis. 82, 84, 178 N.W. 251, 252 (1920). By the same token, assessment of private property subject to "retained mineral rights, timber rights or an easement or any similar interest in such real estate" held by "a Wisconsin governmental unit," sec. 70.32(1), or restrictions on land use imposed by "zoning ordinance," "conservation easement," "conservation restriction under an agreement with the federal government," or under ch. 91, Stats.

156

(farmland preservation), sec. 70.32(1g), must exclude the value of the restrictions or retained interests.[1]

It is undisputed that the artificially low rents that Metropolitan Holding Company must charge have significantly depressed the price for which the property would sell on the open market in an arm's-length trans-

---

[1]Section 70.32(1), Stats., was amended, effective January 1, 1992, as follows:

> Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider, as to each piece, its advantage or disadvantage of location, quality of soil, quantity of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value; but the fact that the extent and value of minerals or other valuable deposits in any parcel of land are unascertained shall not preclude the assessor from affixing to such parcel the value which could ordinarily be obtained therefor at private sale. If on the assessment date occurring in 1957 or in any year thereafter any person other than a governmental unit of Wisconsin owns real estate in which a Wisconsin governmental unit has retained mineral rights, timber rights or an easement or any similar interest in such real estate, the value of any such retained right shall be eliminated in determining the assessable value of such property, and such retained interest shall be excepted in the assessment description of such land and in any notice, tax certificate or tax deed following from any such assessment recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed.

1991 Wis. Act 39 secs. 1722, 9449(30). The amendment codifies accepted assessment practice and recognizes that "full value" is best established by a "recent arm's-length sale," which would, per force, account for any enhancement or diminution of value as the result of the factors deleted from the statutory language.

action. Yet, the Board of Review has disregarded this depressed actual "fair market value" and has assessed the property at a *hypothetical value:* what the property would bring in an arm's-length transaction *if* Metropolitan Holding were able to charge prevailing free-market rates. As justification, the Board of Review and the majority rely on the *Property Assessment Manual for Wisconsin Assessors.*

The *Property Assessment Manual for Wisconsin Assessors* is published by the Department of Revenue pursuant to section 73.03(2a), Stats. The manual's purpose is to "discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level." *Ibid.* The manual is to "reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information deemed valuable to local assessors by the department." *Ibid.* Since "[n]o agency may promulgate a rule which conflicts with state law," sec. 227.10(2), Stats.; *see also Department of Revenue v. Howick,* 100 Wis. 2d 274, 280–281, 303 N.W.2d 381, 384 (1981), neither the department nor the manual may amend or modify the command of section 70.32(1), Stats., that real property in Wisconsin be assessed at its *actual* fair market value. Accordingly, the manual's directive that "[s]ubsidized housing must be valued according to the value it would command if it were free and clear of encumbrances" so that "[w]hen using the income approach for the valuation of subsidized housing, market rents must be used, regardless of whether the contract rents are above or below market rent," 1 *Assessment Manual* at 9–25, withers in face of the statute. *See Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134 (1936) (A regulation that creates "a

rule out of harmony with the statute, is a mere nullity.")
(quoted with approval in *Plain v. Harder,* 268 Wis. 507,
511, 68 N.W.2d 47, 50 (1955) (rule interpreting statutory
phrase "mercantile or manufacturing business" as
encompassing "construction" contracts void)). Since it
is undisputed that no buyer who was not obliged to buy
would purchase the property for its $4.483 million
assessment, that assessment does not reflect the prop-
erty's fair market value. By permitting the *Assessment
Manual* to override section 70.32(1), the Board of
Review failed to act " 'according to law.' " *See State ex
rel. Geipel v. City of Milwaukee,* 68 Wis. 2d 726, 731, 229
N.W.2d 585, 588 (1975) (citation omitted). Accordingly,
we must reverse. *See ibid.*[2] I respectfully dissent.

---

[2]We need not therefore consider whether a statute that
grants tax-assessment relief to some but not all property subject
to government-imposed encumbrances *(see* sec. 70.32(1) & (1g),
Stats.) violates the "uniformity clause" of the Wisconsin Consti-
tution, art. VIII, sec. 1.