COURT OF APPEALS
DECISION
DATED AND FILED

June 11, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1141**

STATE OF WISCONSIN

Cir. Ct. No. **2018CV5246**

IN COURT OF APPEALS
DISTRICT I

---

RIDER HOTEL, LLC, A DOMESTIC LIMITED LIABILITY COMPANY,

PLAINTIFF-APPELLANT,

V.

CITY OF MILWAUKEE, A MUNICIPAL CORPORATION,

DEFENDANT-RESPONDENT.

---

APPEAL from a judgment of the circuit court for Milwaukee County: CARL ASHLEY, Judge. *Affirmed*.

Before Donald, P.J., Geenen and Colón, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Rider Hotel, LLC ("Rider"), owner of the Iron Horse Hotel in Milwaukee ("Property" or "Iron Horse"), appeals from a judgment

of the circuit court dismissing its claims for partial property tax refunds under WIS. STAT. § 74.37(3)(d) (2017-18),[1] arguing that the City of Milwaukee's ("City") 2017 and 2018 assessments of the Property were excessive in violation of WIS. STAT. § 70.32(1).  Specifically, Rider argues that the City's assessments upon which the circuit court relied failed to follow the *Markarian* hierarchy,[2] unlawfully averaged the Property's historical work-up values to calculate the Property's fair market value, and failed to account for "multiple significant factors" affecting the Property's fair market value.  We reject Rider's arguments and affirm.

## BACKGROUND[3]

¶2 Rider brought this action against the City under WIS. STAT. § 74.37(3)(d), claiming that it was entitled to partial property tax refunds because

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] In *State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 685-86, 173 N.W.2d 627 (1970), the Wisconsin Supreme Court set forth a tiered system of approaches for calculating the fair market value of real estate for property tax assessment purposes in which assessors are to apply the highest tier that the best practicably available information will allow. *See also State ex rel. Collison v. City of Milwaukee Bd. of Rev.*, 2021 WI 48, ¶¶23-26, 397 Wis. 2d 246, 960 N.W.2d 1.  The tiered system is now codified at WIS. STAT. § 70.32(1).

Here, the City assessor applied a tier three "income approach" while Rider argues that it should have used a tier two "sales comparison approach."

[3] The parties are reminded that WIS. STAT. RULE 809.19(1)(d)-(e) (2021-22) requires the parties to reference and cite to the record in their appellate briefs.  Citations to proposed findings of fact and conclusions of law filed with the circuit court are technically citations to the record, but they are not as helpful as citations to actual trial transcripts and exhibits, and they are affirmatively unhelpful when the proposed findings themselves contain no record citations.

the City's 2017 and 2018 assessments of the Property were excessive in violation of WIS. STAT. § 70.32(1).[4]

¶3  The circuit court conducted a bench trial from May 24 to May 26, 2021, during which the parties each presented evidence regarding the Property's fair market value, including the testimony and appraisal reports of their respective expert witnesses:  Duane Debelak as Rider's appraiser, and James Wiegand as the City's assessor.

¶4  Debelak performed a tier two "sales comparison approach" to calculate the Property's fair market value.[5]  Debelak identified six properties that he claimed were reasonably comparable to the Iron Horse, but he had to make large adjustments in order to bring those properties in line with the Iron Horse. Four of the six properties reflected a net adjustment between 35% and 40% while another property reflected a 70% net adjustment, and Debelak admitted that "the higher the percentage of adjustment, the less similarity" between the subject property and the comparative property.  The Iron Horse has a full-service restaurant that comprised approximately 40% of its total revenue.  However, only one of the proposed comparable properties had a full-service restaurant like the Iron Horse, while another had a bar/lounge with no onsite kitchen; the remaining four had no restaurant, bar, or lounge.  Additionally, while the Iron Horse is

---

[4] Rider filed timely objections and appeals of the 2017 and 2018 assessments with the City's Board of Review.  The Board of Assessors and Board of Review sustained both assessments and disallowed Rider's claims, prompting the filing of the instant case in the circuit court.

[5] It is undisputed that the Property had not been recently sold, so a tier one approach could not be performed.  Debelak also performed a tier three income approach "as a check" on the tier two sales comparison approach, but he did not rely on the income approach in his final value conclusion.

categorized as an "upper upscale" hotel, only one of the six comparable properties was identified by Debelak as sharing that category.

¶5      Wiegand considered a tier two sales comparison approach, but determined that there were no recent arm's-length sales of reasonably comparable properties.[6]  Quoting the Wisconsin Property Assessment Manual ("WPAM"), Wiegand said that it is extraordinarily difficult to perform an accurate sales comparison approach to hotel properties "because individual properties may differ greatly in services, reputation, age, and location all of which can affect value." Wiegand also cited a textbook by Stephen Rushmore related to the valuation of hotel properties, and testified that Rushmore's method of hotel valuation is employed by the City.  In determining whether other hotel properties were reasonably comparable to the Iron Horse, Wiegand consulted a rank-ordered list of factors from Rushmore.  Wiegand analyzed Debelak's six proposed comparable properties in light of those factors and determined that they were too dissimilar in "location, construction, physical condition, layout, equipment, size, services, and amenities" to support a tier two sales comparison analysis.

¶6      Instead, Wiegand conducted a tier three income approach.  He reviewed the income and expense data provided by Rider for the period from January 1, 2014 to December 31, 2017, in comparison with market data.  Wiegand

---

[6] The 2017 and 2018 versions of the Wisconsin Property Assessment Manual ("WPAM"), which assessors must follow in valuing real property for tax assessment purposes, WIS. STAT. § 70.32(1), defines an "arm's-length sale" as "[a] sale between two parties neither of whom is related to or under abnormal pressure from the other."  1 Wisconsin Property Assessment Manual G-31.

All references to the WPAM are to both the 2017 and 2018 versions unless otherwise noted.

created four individual "work-up" values for 2015-2018, one for each year, based on the prior year's operating data, then averaged those work-up values to reach an opinion of the Property's fair market value as of the assessment date. That is, the work-up value for 2015 was based on 2014 operating data, the work-up value for 2016 was based on 2015 operating data, etc. Wiegand averaged the work-up values for 2015, 2016, and 2017 to reach an opinion of the Property's fair market value as of January 1, 2017. He averaged the work-up values for 2016, 2017, and 2018 to reach an opinion of the Property's fair market value as of January 1, 2018. Wiegand explained that this is the same method used for all established hotels generating income, i.e., averaging three single-year work-ups (two prior years and the assessment year) to form an opinion as to a property's fair market value.

¶7      Wiegand testified that a single-year work-up value alone is not a conclusion as to a property's fair market value for that year. In short, he explained that these work-up values are determined based only on an individual year's operating data, and an opinion is formed as to fair market value by averaging single-year work-up values for the assessment year and the two years prior to the assessment year. Wiegand said that averages are used to best anticipate what a property may experience in the future, and that a knowledgeable and prudent property investor would look for as much information on a property as possible. Debelak agreed that investors would review at least three years of prior operating data when they determine a property's value.

¶8      The circuit court found Wiegand's testimony credible. On the other hand, the circuit court rejected Debelak's appraisal as a reliable indicator of the Property's fair market value because the properties used in Debelak's tier two sales comparison approach were not reasonably comparable to the Iron Horse considering their "lack of similarities" and "the amount of adjustments made" to

them. For these reasons, the circuit court concluded that Rider failed to present significant contrary evidence to rebut the statutory presumption that the City's assessments were correct, and it dismissed Rider's claims.

¶9     Rider appeals.

## DISCUSSION

¶10     When presented with excessive assessment claims under WIS. STAT. § 74.37, we review the circuit court's determination and not the determination of the taxing district's Board of Assessors or Board of Review. *Lowe's Home Ctrs., LLC v. City of Delavan*, 2023 WI 8, ¶23 & n.11, 405 Wis. 2d 616, 985 N.W.2d 69. The City's assessments are entitled to a presumption of correctness under WIS. STAT. § 70.49(2) that "may be rebutted if the assessor did not correctly apply the [WPAM] and Wisconsin statutes or if a challenger presents significant contrary evidence." *Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶32. Whether the City's assessments complied with statutory directives is a question of law that we review independently, but the circuit court's factual findings will not be disturbed unless they are clearly erroneous, i.e., "against the great weight and clear preponderance of the evidence," because "[i]t is within the province of the factfinder to make determinations of the weight and credibility of evidence." *Id.*, ¶¶24-25, 68.

¶11     Rider claims that the City's 2017 and 2018 assessments were excessive in violation of WIS. STAT. § 70.32(1). Section 70.32(1) states that "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual ... from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." "Full value" in the statute has been interpreted

to mean "fair market value." ***Flood v. Village of Lomira, Bd. of Rev.***, 153 Wis. 2d 428, 435, 451 N.W.2d 422 (1990). Section 70.32(1) lists three sources of information used to determine a property's fair market value for tax assessment purposes. "The order in which these sources are listed is indicative of the quality of information each source provides," and this methodology has been described as providing three "tiers" of analysis. ***Lowe's Home Ctrs.***, 405 Wis. 2d 616, ¶28.

¶12 A tier one analysis examines recent arm's-length sales of the subject property as the best information of a property's fair market value. ***Id.***, ¶29. It is undisputed that there were no recent sales of the Iron Horse upon which to base a tier one analysis.

¶13 If the property has not been recently sold, the appraiser moves to a tier two analysis, examining recent arm's-length sales of reasonably comparable properties. ***Id.*** This approach is "based on the premise that similar properties will sell for similar prices on the open market." ***Id.***, ¶42 (quoting 1 Wisconsin Property Assessment Manual 7-24 (2016)). "'[R]easonable comparability' depends upon the degree of similarity between the properties in question." ***Rosen v. City of Milwaukee***, 72 Wis. 2d 653, 686, 242 N.W.2d 681 (1976). The WPAM provides specific factors for assessors to consider in determining whether a property is "comparable" to the subject property, including: "age, condition, use, type of construction, location, design, physical features and economic characteristics." ***Lowe's Home Ctrs.***, 405 Wis. 2d 616, ¶43.

¶14 Finally, if both tier one and tier two information is unavailable, an assessor moves to tier three under which he or she "may consider all the factors collectively that have a bearing on the value of the property," including "cost, depreciation, replacement value, income, industrial conditions, location and

7

occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus, and appraisals produced by the owner." *Id.*, ¶30. As relevant here, "the income approach, 'which seeks to capture the amount of income the property will generate over its useful life,' fits under the umbrella of tier 3 analysis." *State ex rel. Collison v. City of Milwaukee Bd. of Rev.*, 2021 WI 48, ¶26, 397 Wis. 2d 246, 960 N.W.2d 1 (quoting *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶34, 379 Wis. 2d 141, 905 N.W.2d 784).

## I. The City's assessments were conducted in compliance with Wisconsin statutes and the WPAM.

¶15 Rider argues that the City's use of a tier three income approach was unlawful because, in its view, the City did not "even try" to perform a tier two approach based on recent arm's-length sales of reasonably comparable properties. There was conflicting evidence about the existence of reasonably comparable properties, specifically with respect to the degree of similarity between the properties used for comparison in Debelak's tier two approach. Determining whether a property is "reasonably comparable" to the property being assessed depends upon the weight and credibility evidence, and it is therefore an issue of fact that will only be overturned if it is clearly erroneous. *Lowe's Home Ctrs.*, 405 Wis. 2d 616, ¶¶40-72.

¶16 In its decision, the circuit court found that the comparative properties used by Debelak were not reasonably comparable to the Property, crediting Wiegand's explanation for why he relied on a tier three approach and did not conduct a tier two approach. Wiegand said that it is extraordinarily difficult to perform an accurate sales comparison approach on hotel properties "because individual properties may differ greatly in services, reputation, age, and location all of which can affect value." He consulted a rank-ordered list of factors from

Rushmore, independently analyzed Debelak's comparable properties in light of these factors, and determined that they were too dissimilar in "location, construction, physical condition, layout, equipment, size, services, and amenities" to support a tier two sales comparison analysis.

¶17    Moreover, as observed by the circuit court, Debelak had to make large adjustments to the properties he used as the basis of his tier two sales comparison approach.  Four of the six properties reflected a net adjustment between 35% and 40%, while one property reflected a 70% net adjustment, and Debelak admitted that "the higher the percentage of adjustment, the less similarity" between the subject property and the comparative property.  The Iron Horse has a full-service restaurant that comprised approximately 40% of its total revenue, but only one of his comparable properties approached this amount.  Additionally, while the Iron Horse is categorized as an "upper upscale" hotel, only one of the six comparable properties was identified by Debelak as sharing that category.  Other differences include: (1) two of Debelak's comparable properties are located outside of downtown Milwaukee and have no-charge surface parking; (2) Debelak's amenity adjustments were not based on actual market sales; and (3) Debelak did not have average daily rate information for the comparable properties to compare with the Iron Horse.

¶18    Based on this record, we cannot conclude that the circuit court's factual findings were clearly erroneous.  The circuit court carefully examined Wiegand's and Debelak's appraisals, considered the reasons both for and against conducting a tier two approach based on Debelak's proposed comparable properties, and ultimately concluded that Debelak's proposed properties were not reasonably comparable to the Iron Horse.  The circuit court's determination has

ample support in the record and was not "against the great weight and clear preponderance of the evidence." *Id.*, ¶69 (citation omitted).

¶19 Rider also argues that the City's tier three income approach violated Wisconsin statute and the WPAM. Specifically, Rider argues that the Wisconsin Supreme Court's opinion in *Pennsylvania Coal Co. v. Porth*, 63 Wis. 77, 23 N.W. 105 (1885), makes it unlawful for the City to arrive at fair market value for the Property as of January 1, 2017 and January 1, 2018, by averaging assessment work-up amounts from the assessment year and the prior two years. We disagree.

¶20 *Pennsylvania Coal* involved a personal property tax assessed on the coal stored at Pennsylvania Coal Company's yard. The quantity of the coal fluctuated throughout the year, but the statute at issue mandated that "all personal property shall be assessed as of the first day of May in such year." *Id.* at 105 (quoting 1883 WIS. ACT ch. 354). Rather than ascertaining the quantity of coal in Pennsylvania Coal's possession as of May 1 of the assessment year, the city sought to assess the average amount of coal stored at the yard during the entire year preceding May 1, apparently because Pennsylvania Coal reduced their stock to a very small amount as of May 1. *Id.* at 105-06. The *Pennsylvania Coal* court held that while averaging the amount of coal for the assessment year "might be a very just and fair rule," the statute required that the property to be assessed is the amount of coal in the plaintiff's possession on May 1 of the assessment year. *Id.*

¶21 The present case is distinguishable. Whereas the coal stored at the plaintiff's yard fluctuated dramatically over the year in *Pennsylvania Coal*, there is no evidence that the Iron Horse underwent any material physical alterations during the relevant time periods. Wiegand testified that the Iron Horse was stabilized and that any fluctuations in the net income of the Property over the years

were typical. Moreover, nothing in either the WPAM nor Rushmore prohibit the consideration of more than one year of operating data, and Debelak agreed that a knowledgeable commercial property investor would review at least three years of historical operating data in due diligence when they are determining a property's value.

¶22 Accordingly, we affirm the circuit court's conclusion that Wiegand's averaging of historical work-up values did not violate Wisconsin statute or the WPAM.

## II. Rider failed to present significant contrary evidence to rebut the City assessments' presumption of correctness.

¶23 Rider alleges that the City's income approach was deficient because it failed to consider certain factors that it believes were important in determining the Property's fair market value. The circuit court found the City's income approach to be credible and reliable, and those determinations are not clearly erroneous because they have ample support in the record. *See **Lowe's Home Ctrs.***, 405 Wis. 2d 616, ¶69.

¶24 First, Rider argues that "[t]here is no individualization of the [City's] valuation." This argument fails because the work-up amounts used by the City were derived from the Property's actual operating data.

¶25 Second, Rider says that the City should have considered a "29% decline in [fair market values] over a three-year period." The trend Rider highlights was before the circuit court in the reports, Wiegand testified that the Iron Horse was stabilized with normal fluctuations in revenue, and it is within "the province of the factfinder to make determinations of the weight and credibility of the evidence." *Id.*, ¶¶25, 68.

11

¶26    Third, Rider claims that the City failed to subtract a "business component" value from the income valuation, violating the Rushmore approach that the City says it applies. This is not correct. The City's assessment states that "[t]he Rushmore Approach separates [the] business component by deducting management and franchise fees from the hotel[']s stabilized net income." It goes on to state that the Iron Horse "reported a management fee and did not report a franchise fee as this is an independent hotel," and these fees were deducted "as a fixed expense, which reduces hotel's net operating income (and thus reducing its resultant value)."

¶27    Rider points to the following exchange in Wiegand's deposition to support its argument:

> Question: And so we have a business component there that needs to be taken into account, true?
>
> [Wiegand]: I'm not sure how there were any changes to the business. It's still the Iron Horse Hotel. The location is the same. The operating methods have changed slightly along with changes in the effective tax rate and increase expenses. Those were the main drivers for the reduction in value. I can't quantify the business aspect of this hotel. There could be business value.

However, immediately after reading this deposition testimony into the record at trial, Wiegand explicitly denied that he had failed to deduct a "business component separate and apart from the management fee[.]"

¶28    Fourth, Rider argues that the City disregarded increased supply in the Milwaukee hotel market by not assuming the food and beverage revenue and rooms revenue would decrease as a hotel ceases to be "the place to be." However, Wiegand did consider the new supply of hotel rooms coming online in Milwaukee in recent years. Wiegand explained that he ultimately did not make an adjustment

because there are "no guidelines" for reducing a hotel's fair market value in light of increased hotel supply "without actually having actual operating information to review or to confirm that fact." It was not clearly erroneous for the circuit court to credit this testimony.[7]

## CONCLUSION

¶29 The City's assessments were conducted in compliance with the WPAM and Wisconsin statutes. None of the circuit court's factual findings were against the great weight and clear preponderance of the evidence. Accordingly, Rider's excessive assessment claims were properly dismissed.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).

---

[7] Rider invokes *Powers v. Allstate Insurance Co.*, 10 Wis. 2d 78, 102 N.W.2d 393 (1960), arguing that it is willing to forego a new trial as to the Property's fair market value and accept the work-up values for 2017 and 2018 as the fair market value for those years. Even assuming *Powers* applied in this context, Rider failed to demonstrate that the City's assessments were excessive.